Robert J. Collins & others[1] *vs.* Margaret A. Huculak.

No. 01-P-568.

Norfolk. November 8, 2002. - February 20, 2003.

Present: Duffly, Kafker, & Green, JJ.

*Fraudulent Conveyance. Real Property,* Deed, Conveyance.

In a civil action brought by three sons who signed, at the request of their father, a document that the father would not let them read and the nature of which the father misrepresented, and which turned out to be a deed conveying each son's one-quarter interest in the family home to the father and their sister, the judge's finding that the plaintiffs had failed to establish a reasonable reliance on the father's misrepresentations was not clearly erroneous, and the judge's finding that there was no fiduciary relationship or relationship of confidence and trust between the father and the plaintiffs was supported by evidence of the plaintiffs' age, experience, and independence from the father in business and financial matters. [391-396]

Civil action commenced in the Superior Court Department on March 16, 1999.

The case was heard by *Patrick F. Brady*, J.

*Bruce A. Kraft* for the plaintiffs.

*Edward M. Sullivan* for the defendant.

Kafker, J. At a family gathering on Easter Sunday, 1988, John Collins, Sr. (father), summoned his three adult sons, one by one, and demanded that they sign a document that he refused to let them read. He held the document folded over in such a fashion as to conceal its text and any other identifying information. Although initially resistant to their father's demands, each son eventually signed his name, after the father harshly persisted and told each that the document was "for the bank," which was false. Upon the father's death approximately

---

[1] John J. Collins and Thomas C. Collins.

ten years later, the three sons learned that the document they had signed that Easter Sunday was a deed conveying each son's one-quarter remainder interest in the family home to their father and their sister, jointly with right of survivorship. The sons sought declaratory relief, alleging that their signatures on the deed were obtained by the father's fraud. After a three-day bench trial, a judge of the Superior Court ruled that the plaintiffs had failed to establish reasonable reliance on their father's misrepresentations when they signed the deed without reading it and that there was no fiduciary relationship or relationship of confidence and trust between the father and the plaintiffs. The judge, therefore, declared the deed valid.[2]

We conclude that the judge's critical finding regarding the absence of reasonable reliance was not clearly erroneous, given the suspicious, even alarming, nature of the father's behavior that day, according to the plaintiffs' own testimony at trial. Similarly, the judge's finding of no fiduciary or like relationship between the father and the plaintiffs is supported by the plaintiffs' age, experience, and independence from the father in business and financial matters. Also, the plaintiffs do not argue that the defendant, the beneficiary of the father's actions, participated in the misrepresentation and misconduct that resulted in their signing the deed without reading it. We therefore affirm, despite the father's troubling conduct that has left a legacy, which the law cannot remedy, of a family divided.

*Facts.* The following facts were found by the judge and are undisputed by the parties except as noted. Our review of the record provided by the plaintiffs does not disclose any of the findings on which the judge's decision depends to be clearly

---

[2]As originally filed, the complaint appeared to concern title to registered land, over which the Land Court has exclusive jurisdiction. See G. L. c. 185, § 1(*a*¹/₂); *Feinzig* v. *Ficksman*, 42 Mass. App. Ct. 113, 115-117 (1997). However, while the matter was pending in the Superior Court, the defendant, with the plaintiffs' agreement, sold the property, converting the parties' dispute to one over their respective entitlement to the proceeds of the sale. Accordingly, we treat the complaint as having been amended by the implied consent of the parties and, as so amended, within the jurisdiction of the Superior Court. See Mass.R.Civ.P. 15(b), 365 Mass. 761 (1974).

erroneous.[3] *Simon* v. *Weymouth Agric. & Indus. Soc.*, 389 Mass. 146, 148 (1983).

The Collins family purchased a house on Walcott Road in Brookline in 1962, and the plaintiffs — John J. (Jack), Robert J., and Thomas C. Collins — and their sister — Margaret A. Huculak, the defendant in this case — lived there with their parents until they moved out to start their own families. On October 26, 1987, five months after the death of his wife (and the parties' mother), the father conveyed the property to his children for nominal consideration, reserving a life estate to himself, and giving each of the plaintiffs and the defendant a one-quarter remainder interest.

The father still lived there on April 3, 1988. He was seventy-five years old at the time. The plaintiffs were forty-five, forty-two, and thirty-four years of age, respectively. That day, the father, the plaintiffs, and the defendant, along with their own spouses and children, agreed to meet at the house for brunch following an Easter Mass at a nearby church.

Shortly after they arrived at the house, the father called Jack, the oldest son, into the kitchen and told him to sign the document that he presented. Jack observed his father holding his hand over certain parts of the folded-over document. Jack asked two times what the paper was. His father replied, "It's for the bank, just sign the goddamn paper." The judge found that Jack "placed no reliance whatsoever on his father's representations.[4] He simply signed because his father wanted him to do [so]."[5]

After obtaining Jack's signature, the father called Robert into

---

[3]The defendant objects to the incompleteness of the record provided by the plaintiffs, but has not moved to supplement the record or otherwise directed our attention to any omitted portions of the record that support her position.

[4]The plaintiffs contest this finding, but the record supports it. Under questioning by the judge, Jack admitted that he had not put any stock in the father's statement that the document was "for the bank."

[5]The judge found that when Jack signed the document, "the prefatory language above the signature lines[,] 'WITNESS our hands and seals. . . .' was visible[,] along with 'THE COMMONWEALTH OF MASSACHU-SETTS' under the signatures." Jack testified, however, that all he could see "was my name, where it was preprinted . . . . I could see [my father's] name above me, that was preprinted. And I could see that his was signed — his name was already signed on it. That's all I could read on the document. I

the kitchen and told him to sign the same document. Robert questioned his father to a greater extent than had his older brother and tried twice to take the document from his father in order to read it. This caused his father to get "very upset and loud." After stating that "[i]t's for the goddamn bank," he ordered Robert to "[s]ign the paper." Robert signed, although the judge found he "did not understand what his father meant by 'for the bank.' " The judge found that "[b]ecause his father was so upset and hostile, and because Robert, at least on this morning, did not want to argue the point, he bowed to his father's wishes and signed the document."

The father next summoned Thomas, the youngest son, and the scene was repeated. Thomas, known "affectionately" in the family as "Meathead," referred to his father as "tough" and "the rule." (According to the judge, Thomas regarded his father as "the ruler.") Thomas, an "agreeable sort," in the judge's words, asked his father only once what the document was for, but then signed it "without fuss," after his father informed him it was "for the bank."

On April 28, 1988, the father and the defendant appeared before a notary public with whom the father had a close relationship, having worked for him from time to time following the father's retirement. The father and the defendant signed their names to the document, affirming that as their "free act and deed." The notary then witnessed their signatures, along with those of the plaintiffs, who did not appear before him.[6]

For most of his adult life, the father had worked at an oil company on the 4:00 P.M. to midnight shift. He earned extra money by washing windows, painting, and cleaning gutters. Jack was an experienced businessman who had earned a degree in business administration from Northeastern University in 1967 and owned several pieces of real estate including investment

---

could not see anything above it or to the right of it." The judge did not credit Jack's testimony on this point. Regardless, the judge did not refer to this fact in his legal analysis and, even if the finding were clearly erroneous, we do not consider it material to the analysis.

[6]Although the plaintiffs did not appear before the notary, the requirement of an acknowledgment of due execution on the deed goes only to its recording. See G. L. c. 183, § 29. Failure to record a deed does not affect its validity as among the parties to it. G. L. c. 183, § 4.

properties. Robert worked as a mechanic until his disability retirement in 1991; by the time he signed the deed, Robert had owned at least three houses. Thomas had earned a certificate from Franklin Institute in 1975 and in April, 1988, was working as an equipment maintenance division supervisor for the town of Natick. The judge found, and the plaintiffs do not dispute, that none of the plaintiffs relied on their father for advice in business or financial matters.

The judge found that the father "did intentionally misrepresent the nature of the document which he asked (or more accurately, demanded) his sons to sign on April 3, 1988." The judge determined, however, that the plaintiffs' case for fraud failed on the element of reliance on their father's statement that the document was for the bank, which the judge found was not reasonable in the circumstances. He also determined that no fiduciary or similar relationship of trust and confidence between the father and the plaintiffs sons existed. He reasoned: "The plaintiffs no doubt trusted their father, but they were not dependent upon him in business or property matters."

The plaintiffs contend that they acted reasonably as "trusting sons, . . . not imagining that they were . . . being cheated by their father on the first Easter after their mother's death, in the presence of their wives and children." They argue that the deed should, therefore, be set aside because of the father's fraudulent misrepresentation, upon which they claim they reasonably relied, that the document was "for the bank."

*Discussion.* A deed procured by fraud may be voided by the court. *Long* v. *Giraudo*, 311 Mass. 132, 138 (1942). *Wojtkonski* v. *Wojtkonski*, 331 Mass. 760, 760 (1954). A plaintiff alleging fraud must, however, prove that "the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8 (1982), quoting from *Barrett Assocs.* v. *Aronson*, 346 Mass. 150, 152 (1963). See *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 192 (1999). The plaintiff's reliance on the defendant's false statement must be reasonable and justifiable under the circumstances. See *Shaw* v. *Victoria Coach Line, Inc.*, 314 Mass.

262, 266, 267 (1943); *Hogan* v. *Riemer*, 35 Mass. App. Ct. 360, 365 (1993); Restatement (Second) of Torts § 537 (1977) ("The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, [a] he relies on the misrepresentation in acting or refraining from action, and [b] his reliance is justifiable"). The person claiming justifiable reliance is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory examination or investigation." Restatement (Second) of Torts, *supra* at § 541 comment a. See *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, 438 Mass. 459, 468 (2003). Finally, "the question, whether the plaintiff exercised due diligence and was justified in placing confidence in the statement of the defendant or should have known from the beginning that [the statement was false]," is one of fact. *Jekshewitz* v. *Groswald*, 265 Mass. 413, 417 (1929). See *Sheffer* v. *Rudnick*, 291 Mass. 205, 210-211 (1935).

It is undisputed that the father lied about the true nature of the document that he demanded the plaintiffs sign. The question then becomes whether the plaintiffs relied on that misrepresentation when signing and, if so, whether their reliance was reasonable or justifiable. The trial judge explicitly found that Jack "placed no reliance whatsoever on his father's misrepresentation," but, rather, signed because his father "wanted him to do so." He found that Robert "did not understand what his father meant by 'for the bank' " but signed anyway because of his father's hostility and his desire to avoid a confrontation at a family gathering on Easter, thereby suggesting no reliance on the statement by him either. The judge did not, however, make any express finding of no reliance in regard to Robert. For the third son, Thomas, the judge made no finding, implicit or explicit, suggesting the absence (or presence) of reliance.

Even if we accept the plaintiffs' argument that each of them relied upon the father's misrepresentation, we must consider whether such reliance was reasonable. The plaintiffs were summoned individually to meet with their father. He demanded they sign a document folded over to avoid their review. Their signatures were required for the document to be valid; hence,

the father's demands. The plaintiffs could see their names appearing in type below the signature lines. At a minimum, the circumstances were suspicious. The father pulled the document away from Robert when he grasped it, and he responded harshly to any questioning. All three plaintiffs should have been on notice that the document was of significance and legal import. See and compare *Farrell* v. *Chandler, Gardner & Williams, Inc.*, 252 Mass. 341, 345 (1925); *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 440 (1980).

Moreover, even the most cursory examination of the document would have revealed (a) that it was not "for the bank" as the father had represented, and (b) that it was in fact a deed conveying away the plaintiffs' interests in the Brookline property. See, e.g., *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, *supra* at 468 ("cursory review of . . . language . . . would have alerted [plaintiffs] that they could not rely on . . . statements"). We conclude that the record supports the judge's finding that it was not reasonable or justifiable in these circumstances for the plaintiffs to sign the document without reading it.[7]

The judge was right to point out that if this were a "business

---

[7]See and compare *Farrell* v. *Chandler, Gardner & Williams, Inc.*, *supra* at 343-344 ("[b]right, intelligent person [who could] read English and [] had fifteen years of business experience" was bound by agreement she signed, which was given to her "folded over," and which she did not read); *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, *supra* ("[r]eliance on any statement or conduct . . . was unreasonable as a matter of law because it conflicted with the qualifying language [in a document plaintiff chose not to read]"); *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, *supra* ("One who knowingly signs a writing that is obviously a legal document without bothering to ascertain the contents of the writing is ordinarily bound by its terms, in the same manner as if he had been fully aware of those terms, unless it can be proved that he was induced to sign it by fraud or undue influence. . . . That he does not know the terms that he is agreeing to is not a mistake, but a conscious choice and a known risk"); *Mayflower Seafoods, Inc.* v. *Integrity Credit Corp.*, 25 Mass. App. Ct. 453, 459 (1988) (even if he did not read lease agreement, plaintiff who "signed what was 'obviously a legal document without bothering to ascertain' its contents . . . , as matter of law, was bound by its terms [in the absence of a clear fiduciary relationship, which does not appear here]" [citation omitted]); *Hull* v. *Attleboro Sav. Bank*, 33 Mass. App. Ct. 18, 24 (1992) ("One who signs a writing that is designed to serve as a legal document . . . is presumed to know its contents"); *Commerce Bank & Trust Co.* v. *Hayeck*, 46 Mass. App. Ct. 687, 693 (1999) (plaintiff was bound "by the terms of a note he voluntarily signed but did not read"). Contrast *Freedley* v. *French*, 154 Mass. 339, 342 (1891) (jury decided

transaction at arm's length, the plaintiffs would have little basis for a claim." He also correctly observed that a "family relationship between father and sons casts a somewhat different light on the transaction, but it does not alter the result" of the lack of reasonable reliance here. We too recognize that there are subtle, and not so subtle, familial considerations involved in such a transaction that may affect the reasonableness of a family member's reliance. Nevertheless, the circumstances here were suspicious enough to support the judge's finding that three adult, independent sons could not reasonably have relied on their father's misrepresentation to excuse them from that most fundamental legal responsibility to review a legal document before signing it.[8]

The judge recognized that "[s]ome family relationships may involve a heightened duty to disclose" and that the case would stand on a different footing were there a "fiduciary or other similar relationship of trust and confidence" between the father and the plaintiffs. See Restatement (Second) of Torts, *supra* at § 551(2)(a). Nevertheless, "a confidential relationship does not arise merely by reason of family ties." *Rood* v. *Newberg*, 48 Mass. App. Ct. at 193. "Whether a relationship of trust and confidence exists is a question of fact . . ." *Markell* v. *Sidney*

that plaintiff, who did not read legal document procured by fraudulent representation, was not negligent "considering all the circumstances").

[8]The plaintiffs have not expressly made an undue influence argument, which would have required a showing "that an (1) unnatural disposition of property [was] made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact . . . used that opportunity to procure the contested disposition through improper means." *Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 464 (1997), quoting from *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. 218, 223 (1986). Undue influence is that which "destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammelled desire." *Neill* v. *Brackett*, 234 Mass. 367, 369 (1920). Undue influence cases generally involve a plaintiff in a weakened state of body or mind, see *Campbell* v. *Lima*, 212 Mass. 11, 12 (1912); *Neil* v. *Brackett, supra* at 369, 371, or who lacks "that strength of character required to resist the overpowering will of another." *Lyons* v. *Elston*, 211 Mass. 478, 482 (1912). None of the plaintiffs exhibited that "weakness of mind" or lack of strength of character that could render them susceptible to such influence. The youngest son's reference to his father as "the rule," and his overall "agreeable" nature do not, without more, constitute proof of undue influence.

*B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. at 444.[9] The relationship "may be found on evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters." *Ibid.* See *Ranicar* v. *Goodwin*, 326 Mass. 710, 713 (1951).

The judge determined that "[t]he plaintiffs no doubt trusted their father, but they were not dependent upon him in business and property matters."[10] No fiduciary or confidential relationship existed in these circumstances, he concluded. This conclusion is supported by the judge's subsidiary findings, including that the plaintiffs were all independent adults in their thirties or forties who did not depend on their father's advice in real estate, financial, or business matters. The judge correctly focused, as the cases require, upon the importance of showing a dependency in business, property, or financial matters in order to establish a confidential relationship.[11]

---

[9]See *Hayes* v. *Moulton*, 194 Mass. 157, 165 (1907) ("It was a question for the jury to determine whether and how far there was a relation of trust and confidence . . ."); *Rudow* v. *Fogel*, 12 Mass. App. Ct. 430, 439 (1981). Cf. *Warsofsky* v. *Sherman*, 326 Mass. 290, 293 (1950) ("The existence of [a fiduciary] relationship in any particular case is to be determined by the facts established"). But see *Akin* v. *Warner*, 318 Mass. 669, 674 (1945) (whether there was fiduciary relationship was "mixed question of law and fact").

[10]A similar distinction was drawn in *Bruno* v. *Bruno*, 384 Mass. 31, 33 (1981), where the court found no fiduciary duty because the ninety-nine year old plaintiff was not shown to be dependent on her nephew or other family members in business matters. "There may have been a relationship of mutual regard, but mere respect for the judgment of another or trust in his character is not enough to constitute a confidential relationship." *Ibid.*

[11]Compare *Peirce* v. *Moison*, 256 Mass. 528, 533 (1926) (confidential relationship found where "enfeebled" plaintiff spoke no English and depended solely on defendant, who was stepbrother of plaintiff's deceased husband, for advice and guidance in affairs); *Jason* v. *Jason*, 289 Mass. 72, 77-78 (1935) (confidential relationship found where defendant was "prospective husband of the plaintiff . . . upon whom she relied to see to it that proper deeds were prepared to carry out the [prenuptial] agreement between them"); *Stetson* v. *French*, 321 Mass. 195, 199 (1947) (confidential relationship found where defendant was "a capable man of affairs and property" who handled financial matters for his two illiterate younger brothers who worked for him); *Broomfield* v. *Kosow*, 349 Mass. 749, 755 (1965) ("In redressing an abuse of trust and confidence[,] equity will review such factors as the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions

Finally, we recognize that the sister, not the father, is the defendant here. The plaintiffs did not allege that the defendant was involved in the conduct that led to their signing the deed. Nor does the record give any indication of the defendant's knowledge of the circumstances under which each plaintiff had signed the deed. See *White* v. *Graves*, 107 Mass. 325, 328 (1871) ("a person who voluntarily executed a deed, although induced to do so by fraud, [can] avoid it only as against the party who exercised the unlawful influence, or against one who took title under the deed with participation in or notice of the fraud, and not against one who took a title apparently good from those having capacity to convey"). In the absence of any record support for the defendant's knowledge of, complicity in, or participation in the father's misrepresentation, we decline to consider her a wrongdoer seeking to benefit from her own misconduct. See *Capen* v. *Capen*, 234 Mass. 355, 364-365 (1920).

*Judgment affirmed.*

---

wherein the defendant has specialized knowledge"); *Rood* v. *Newberg*, 48 Mass. App. Ct. at 193 (grandson had confidential relationship with grandmother who was "very dependent" upon him in financial and other matters). Contrast *Hill* v. *Hill*, 278 Mass. 44, 51 (1931) ("relationship of uncle and nephew and . . . the friendship and confidence growing out of that relationship did not create a fiduciary relationship in the legal sense" where uncle had never advised nephew in particular matter at issue); *Kelly* v. *Kelly*, 358 Mass 154, 156 (1970) (no confidential relationship found where plaintiff did not rely on defendant in financial matters); *Bruno* v. *Bruno*, 384 Mass. at 33 (no evidence of plaintiff's dependence on her nephew in her business or personal affairs).