GRAZYNA ROSTANZO vs. STEPHEN ROSTANZO, executor.[1]

No. 06-P-1953.

Middlesex. October 11, 2007. - January 29, 2009.

Present: PERRETTA, BERRY, & TRAINOR, JJ.

*Contract,* Antenuptial agreement, Validity. *Husband and Wife,* Antenuptial agreement. *Will,* Validity, Undue influence. *Practice, Civil,* Burden of proof. *Undue Influence. Fraud. Trust,* Constructive trust.

In consolidated actions in the Probate and Family Court challenging a petition for probate of a will and seeking to invalidate an antenuptial agreement (agreement), the judge erred in concluding that the agreement was invalid, where, prior to signing the agreement, the widow was represented by independent counsel of her choice, who negotiated new terms of the agreement on behalf of the widow and accompanied her to the signing meeting [595-597]; where the decedent's failure to disclose his liabilities in estimating his net worth and resources was an error in the widow's favor, and nothing in the evidence showed how the disclosure of the information would have materially affected the widow's decision to sign the agreement [598-599]; where the agreement made fair and reasonable provision for the widow, in light of the widow's and the decedent's respective ages, literacy, education, financial worth, and business acumen [599-602]; and where the clause in the agreement recognizing that the widow and the decedent waived their interest in real estate held solely in the other's name (or as cotenant with a third party) at the time of his or her death and their interest in or claim to any inherited property either might receive from his or her family was enforceable [602].

In consolidated actions in the Probate and Family Court challenging a petition for probate of a will and seeking to invalidate an antenuptial agreement, the judge properly assigned to the widow the burden of proof on her objections to the will [602-604]; moreover, the judge correctly concluded that the widow had not satisfied her burden of proof on her claims either that the decedent's attorney, by means of coercion, overpowered the mind of the decedent and caused him to make a will that embodied the attorney's dominating purpose rather than the decedent's wishes [604-606] or that the decedent made false promises to the widow and abused a confidential relationship [606-608], but the judge erred in concluding that the widow was entitled to the widow's statutory share of the decedent's estate, as by entering into a valid and binding antenuptial agreement, the widow waived any right she might otherwise have had as a widow [608].

[1]Of the estate of Nicholas Rostanzo. Stephen Rostanzo is also one of the decedent's four children.

This court declined to consider a challenge to an order denying the imposition of a constructive trust, where the claim did not rise to the level of appropriate appellate argument. [608-609]

PETITION for probate of a will filed in the Middlesex Division of the Probate and Family Court Department on February 2, 2005.

COMPLAINT in equity filed in the Middlesex Division of the Probate and Family Court Department on July 27, 2005.

After consolidation, a motion for summary judgment was heard by *Judith Nelson Dilday*, J.; the case was heard by her; a motion for a new trial was also heard by her; and entry of an amendment to the judgment to deny a claim for imposition of a constructive trust was ordered by her.

*Timothy J. Burke* for the plaintiff.

*Steven E. Kramer* for the defendant.

PERRETTA, J. When Stephen Rostanzo (the executor) filed a petition for probate of the will of his father, Nicholas Rostanzo (the decedent), the decedent's widow, Grazyna Rostanzo (the plaintiff), filed an affidavit of objections and, subsequently, a complaint seeking to invalidate her antenuptial agreement (agreement) with the decedent and to establish a constructive trust over a building owned by a limited liability corporation formed by the decedent during their marriage. The actions were consolidated for trial, after which a judge of the Probate and Family Court voided the agreement and denied the plaintiff's objections to the decedent's will and her request for the imposition of a constructive trust. The plaintiff and the executor filed timely cross appeals. We conclude that the agreement and the decedent's will control the disposition of his assets.

1. *Background.* We summarize the relevant facts found by the judge, supplemented by undisputed facts in the record, while reserving certain details for our discussion of the issues presented on these cross appeals.

a. *The premarital relationship.* In October, 1996, the decedent, an American citizen, met the plaintiff, a Polish national then living in Poland, when the plaintiff was visiting friends in the United States. Although it appears that the decedent was somewhat older than the plaintiff, the plaintiff states that "both

[had] achieved middle age." From 1997 through 2001, they maintained a long-distance romantic relationship during which they would visit one another several times each year. During those years, the plaintiff owned and operated two cosmetology businesses and a condominium in Poland and supported her daughter, who was born of one of her two prior marriages. Sometime in 2000, the plaintiff and the decedent began to discuss marriage and whether they would make their home in Poland or the United States should they decide to marry.

Since the parties intended eventually to marry, the plaintiff, in August, 2001, moved to the United States to live with the decedent in his home in Watertown. Her daughter, then nineteen years of age, thereafter followed and took up residence with them while attending college, for which the decedent paid the tuition.

About four months after the plaintiff's arrival in the United States, the decedent raised the issue of the agreement with her and suggested that his attorney, David Smith, assist them in preparing such an agreement. Smith had been providing the decedent with advice on his personal real estate holdings and tax-related matters since 1985. The plaintiff and the decedent met with Smith on December 4, 2001, to discuss several matters, including the preparation of the agreement. During this meeting, Smith did not discuss issues relating to the attorney-client privilege or conflicts of interests.[2] The judge found that at the time of this meeting, the plaintiff believed that Smith was acting as her attorney as well as the attorney for the decedent and that no interpreter was present at the meeting despite the plaintiff's difficulties with the English language.

On December 7, 2001, Attorney Smith sent two copies of a draft agreement to the decedent's home under cover of a letter addressed solely to him. According to the evidence presented, the decedent gave a copy of the draft agreement to the plaintiff "after the holidays." The plaintiff attempted to translate the draft of the agreement into Polish. About two weeks into January, a friend of

---

[2]During his appearance as a witness at the trial, Attorney Smith related that he had provided legal representation on behalf of the decedent during December, 2001, and January, 2002, and that he had no attorney-client relationship with the plaintiff during that time. He also testified that during the meeting under consideration, he advised the plaintiff to retain independent legal counsel to assist her in the preparation and review of the agreement.

the plaintiff advised her to retain separate counsel to represent her in the negotiation and execution of the agreement. The friend referred her to Elzbieta Fadrowska, an attorney fluent in Polish but, as found by the judge, without experience in matters of contracts or antenuptial agreements.

Attorney Fadrowska received a copy of Attorney Smith's draft agreement no later than January 18, 2002, the date upon which she undertook representation of the plaintiff.[3] Fadrowska thereafter reviewed each term of the agreement with the plaintiff over the telephone. Following these telephone consultations with the plaintiff, Fadrowska proposed to add certain terms to the agreement pertaining to the parties' rights upon divorce.

Negotiations between Attorney Smith and Attorney Fadrowska resulted in the addition of a new provision in the agreement. This new provision required the decedent to make a monetary payment to the plaintiff in the event their marriage was terminated by divorce within three years of the marriage. The amount of the payment was dependent upon which party filed for divorce. If the decedent filed for divorce, he was to pay the plaintiff $60,000. Should the plaintiff initiate divorce proceedings, the decedent was to pay her $10,000. The new provision also required that, should the decedent be the party to file for divorce, he maintain a life insurance policy in the amount of $100,000 for the plaintiff's benefit for a period of five years from the date of entry of a final judgment of divorce.

On January 26, 2002, the plaintiff and decedent, while represented by Attorney Fadrowska and Attorney Smith, signed the agreement in the presence of their respective attorneys. The signed agreement provided in pertinent part:

> "Except as otherwise . . . expressly provided [herein], the individual property of each . . . part[y], as specified on a [schedule of assets] attached hereto . . . hereinafter . . . the [Scheduled Property], shall remain and be the sole and exclusive property of the Husband and/or Wife, as appropriate, subject to his or her individual control, use

---

[3]According to the plaintiff, she did not pay Attorney Fadrowska for her services. Rather, the friend who referred her to Fadrowska "was supposed to pay" Fadrowska, and the plaintiff was "supposed to" repay her friend by providing her with babysitting services.

and disposition as if he or she were unmarried. Neither party shall acquire, by reason of the marriage, any interest in such Scheduled Property of the other . . . or any interest in . . . any income [therefrom] or in the increase in value arising therefrom, or in any proceeds from any disposition thereof . . . ."

The schedules of assets appended to the signed agreement showed that the decedent held real property with a total value of approximately $1,136,000 and personal property, primarily bank accounts, money market accounts, and individual retirement accounts, valued at $196,960. The decedent's schedule of assets did not reflect the fact that his real estate holdings were subject to mortgage liabilities in the total amount of $400,000, thereby reducing their value to $736,000, and the total value of his estate to about $932,960.

According to the plaintiff's schedule, she had three assets: a condominium, a bank account, and a 1998 Fiat Punto automobile, all located in Poland. She provided no information as to the value of any of these assets.[4] As reflected on the record before us, the decedent provided his schedule of assets to Attorney Fadrowska on January 21, 2002, that is, five days prior to the signing of the agreement.[5] The plaintiff provided her schedule of assets to the decedent on the very day that the parties signed the agreement, that is, January 26, 2002.

The agreement also provided that in the event of one party's death, the other waived "any and all" interest in real estate held by the deceased in his or her sole name or as cotenant with anyone other than the surviving spouse. As pertinent, other provisions of the agreement stated that "[t]he parties . . . shall, at their options, execute . . . estate plans or wills which are consistent with the provisions" of the agreement, provided, however, that nothing in the agreement "shall limit or prohibit either [party]

---

[4]Although the plaintiff's schedule of assets disclosed a bank account in an unspecified amount, it did not disclose her ownership of her two cosmetology businesses which she owned at the time of her move to the United States in August, 2001.

[5]The plaintiff makes no claim on appeal that she was not provided an adequate opportunity to review and consider the financial information given her by the decedent.

from naming the other as a beneficiary of their will . . . or being more generous to the other than as set forth in [the] Agreement."

The agreement provided that in the event of a divorce, assets acquired by the parties during the marriage "together and/or by either of them individually" were to be considered part of the marital estate subject to an equitable division. This provision was also made applicable to all jointly held assets regardless of their source.

As further provided by the agreement, the parties waived their interest in or claim to any inherited property either might receive from his or her family. The agreement contained no explicit waiver of the plaintiff's right to seek alimony. The agreement also contained a clause by which both the plaintiff and the decedent each acknowledged that he and she understood its terms and the implications thereof, and that each had been "fully advised by counsel of [their] own selection as to all the rights conferred by law upon each of them by virtue of the proposed marriage, and the legal effect of [the] agreement."

After the plaintiff and the decedent signed the agreement, the decedent and Attorney Smith excused themselves and met alone. At that time, the decedent signed the will to which the plaintiff now objects. The facts relevant to the decedent's will are as follows.

On January 9, 2002, the decedent transmitted by facsimile a letter to Attorney Smith stating that he wished to leave one-half of his interest in his Watertown residence as well as one-half of everything acquired after his marriage to the plaintiff while also maintaining a life insurance policy designating the plaintiff as the beneficiary, and a cash bequest of $50,000. He also indicated that he wished to leave "the land and the property and the money" to his children in equal shares.

Attorney Smith's response was to advise the decedent of the possibility that any real estate that he might bequeath to the plaintiff could ultimately, if she should remarry, pass to her spouse and any children born of her subsequent marriage rather than his four children. The decedent then revised his estate plan. Under the terms of the decedent's will, executed on January 26, 2002, the only bequest to the plaintiff, should she survive him, was a cash bequest in the amount of $120,000. With the exception of

tangible personal property, which was to be distributed by the executor among the decedent's "issue," and a bequest in the amount of $15,000 to his daughter to be used for her wedding, the decedent left the remainder of his estate to his four children in equal shares. About ten days after the decedent's death on January 23, 2005, the executor presented the will for probate.

b. *The marital relationship.* On January 28, 2002, two days after the plaintiff and the decedent signed the agreement and the decedent signed his will, the plaintiff and the decedent married. Between autumn, 2002, and the time of the decedent's death on January 23, 2005, the plaintiff was employed as a secretary for a company referred to in the record as "NJR," a company that she claims was owned by the decedent. The plaintiff testified that she received a weekly salary in the amount of $399, as well as health insurance, through NJR. The trial judge made no findings concerning the plaintiff's employment by NJR or the nature of the decedent's ownership interest in that company.

Either prior to or after parties' marriage, the decedent caused or brought about the purchase of an apartment building located in Delray Beach, Florida, in the name of Delray Crossing, LLC (Delray), a Florida limited liability company in which he was the sole member and which he apparently formed for the purpose of making the purchase. Although the plaintiff testified at trial that she provided secretarial services concerning the Delray property, it does not appear that she received any compensation for her secretarial services other than her weekly salary from NJR. Again, the judge made no findings on this question.

2. *The plaintiff's assertions.* In support of her claim that the judge was correct in concluding that the agreement was invalid, the plaintiff argues that (1) the agreement was invalid at the time of its execution because the decedent violated the "fair disclosure" rule set out in *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979); (2) the agreement was neither fair nor reasonable; and (3) the waiver clause in the agreement was procured through misrepresentations made by the decedent and their "mutual counsel," Attorney Smith, concerning the decedent's will.

As for the judge's conclusion that the decedent's will was valid, the plaintiff contends that the will should not be admitted to probate because (1) the judge erroneously placed upon her

the burden of proving her allegations in support of her affidavit of objections to the will; (2) the decedent acted in violation of his confidential relationship with her by making a fraudulent oral promise to her that he would take care of her in his will by leaving her certain property, see part 3(b), *infra*; and (3) the will was procured through the undue influence of Attorney Smith.

In support of her claim that a constructive trust should have been imposed upon Delray, the plaintiff argues, again, that the decedent violated his fiduciary duty to her.

3. *Discussion.* We begin our discussion of the plaintiff's numerous arguments with her claims concerning the antenuptial agreement.

a. *The antenuptial agreement.* In taking up the plaintiff's contentions in support of the judge's determination that the agreement was invalid, we begin with *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 26 & n.16 (2002), wherein the rule announced in *Rosenberg* v. *Lipnick*, 377 Mass. at 672-673, was quoted in support of its reasoning. As the court held in *DeMatteo, supra*, to be valid at the time of its execution, an antenuptial agreement "must . . . comport with the rules governing the formation of all contracts, [including] the absence of fraud, misrepresentation, and duress," and must also satisfy the "fair disclosure" rules announced in *Rosenberg, supra.*

As described by the court in *Rosenberg* v. *Lipnick, supra* at 672, the "fair disclosure" rules require a judge to determine whether "(1) [the agreement] contains a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement; (2) the contesting party was fully informed of the other party's worth prior to the agreement's execution, or had, or should have had, independent knowledge of the other party's worth; and (3) a waiver by the contesting party is set forth." In considering whether the agreement's terms are substantively "fair and reasonable," a court may properly consider "such factors as the parties' respective worth, . . . ages, . . . intelligence, literacy, and business acumen, and prior family ties or commitments." *Ibid.* See *Austin* v. *Austin*, 445 Mass. 601, 604 (2005).

In *DeMatteo* v. *DeMatteo*, 436 Mass. at 31, the court further defined the circumstances in which a court will decline to enforce

an agreement on the ground that its terms do not make "fair and reasonable" provision for the contesting party, stating that "[i]t is only where the contesting party is essentially stripped of substantially all marital interests that a judge may determine that an antenuptial agreement is not 'fair and reasonable' and therefore not valid." Although the matter before us concerns the parties' agreement as it relates to the death of a party, whereas the agreement in *DeMatteo* concerned the rights of the parties to an agreement upon divorce, we need not question the applicability of *DeMatteo* to the present instance.

Our analysis proceeds on the basis that in the circumstances before us, *DeMatteo* controls the question of the validity of the agreement because (1) the plaintiff and the executor proceeded in the Probate and Family Court on the basis that *DeMatteo* controlled the outcome of their dispute concerning the validity of the antenuptial agreement; (2) the probate judge applied *DeMatteo* in ruling upon the arguments of the plaintiff and the executor; and (3) neither the plaintiff nor the executor argues on appeal that the judge erred in applying *DeMatteo* to the facts found by her. See *Bongaards* v. *Millen*, 440 Mass. 10, 28 (2003) (counselling against the practice of "reach[ing] out to decide issues" neither raised nor briefed by the parties); *Larson* v. *Larson*, 28 Mass. App. Ct. 338, 341 (1990) ("theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review").

Having set out the controlling principles of law, we turn to the reasons the judge set out in support of her determination that the agreement was invalid.

(i) *Access to counsel.* In concluding that the plaintiff had "no meaningful opportunity to have independent counsel," the judge appears to have taken the view that Attorney Smith represented the plaintiff as well as the decedent in respect to the antenuptial agreement. The judge found that the plaintiff believed that Smith represented her as well as the decedent, that Smith failed to advise the plaintiff to seek independent counsel "even though he was representing both parties," and that there was no credible evidence that Smith represented the best interests of both the plaintiff and the decedent when drafting the antenuptial agreement. The judge's ultimate finding on the matter of the plaintiff's

legal representation was that Smith had not represented the plaintiff with the "sense of duty and loyalty a lawyer must give his or her client."

Although we accept the judge's finding that the plaintiff believed that Attorney Smith represented her as well as the decedent at the time of their initial meeting on December 4, 2001, we cannot ignore the undisputed evidence that no later than January 18, 2002, the plaintiff was represented by independent counsel of her choice, Attorney Fadrowska. Nor can we ignore the facts that while representing the plaintiff, Fadrowska negotiated new terms of the agreement on behalf of the plaintiff and accompanied her to the meeting at which the plaintiff and the decedent reviewed and signed the agreement.

These undisputed facts establish that no later than mid-January, 2002, the plaintiff had put aside any trust or confidence that Attorney Smith represented her best interests as well as those of the decedent. The facts that Attorney Fadrowska did not actually meet with the plaintiff until the day the agreement was signed and, instead, conducted many telephone interviews with the plaintiff and that, as found by judge, Fadrowska had "no experience with contracts or prenuptial agreements" do not mean, as matter of fact or law, that the plaintiff had no meaningful opportunity to consult with independent counsel of her choice without interference from the decedent at the time of the signing of the agreement on January 26, 2002.

While the plaintiff now attributes her dissatisfaction with the terms of the agreement to her attorney's "inexperience," there is nothing in the record that hints or shows that she has pursued any claim against Attorney Fadrowska on the basis of inadequate legal representation. Even had the plaintiff pressed such a claim, our conclusion would be no different on the facts found by the judge and the undisputed evidence. As stated in *DeMatteo* v. *DeMatteo*, 436 Mass. at 29 n.22, "[t]o the extent there was an inadequacy of representation by the wife's attorney, that is a claim of the wife against her lawyer, not a basis for voiding the antenuptial agreement."[6]

---

[6]Our conclusion on the question of the plaintiff's access to independent legal counsel applies with equal force to her perfunctory argument that her assent to the agreement's waiver clause was due to the misrepresentations of the decedent and the "parties' mutual counsel," i.e., Attorney Smith.

(ii) *The decedent's financial disclosures.* "Full and fair" financial disclosures are a "significant aspect" of fair dealings between parties entering into an antenuptial agreement and an essential prerequisite for a meaningful waiver of marital rights. *DeMatteo* v. *DeMatteo*, 436 Mass. at 27-29. See *Rosenberg* v. *Lipnick*, 377 Mass. at 672-673. To determine whether a party's obligation of fair disclosure was satisfied, the focus of a court's inquiry is whether "the disclosure [was] such that a decision by the opposing party may reasonably be made as to whether the agreement should go forward." *DeMatteo* v. *DeMatteo, supra* at 27. See Kindregan & Inker, Family Law and Practice § 20.7, at 756 (3d ed. 2002) ("The issue is whether an intelligent, competent person did have or should have had a general, adequate and sufficient knowledge of the other's worth to make an informed decision as to whether they wished to consent to the terms of the proposed premarital agreement"). Cf. *In re Estate of Lopata*, 641 P.2d 952, 955 (Colo. 1982), quoted with approval in *DeMatteo* v. *DeMatteo, supra* (fair disclosure "is not synonymous with detailed disclosure," but "contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other").

In concluding that the agreement was invalid, the judge reasoned that the decedent's failure to disclose his liabilities in the amount of $400,000 violated his obligation to make full and fair disclosure to the plaintiff prior to her acceptance of the terms of the antenuptial agreement. In support of the judge's conclusion, the plaintiff argues in two short paragraphs that she was not fully informed of these liabilities when she signed the agreement. Her assertion is predicated upon the undisputed fact that the decedent failed to disclose in his schedule of assets that his realty holdings were encumbered by mortgages in the amount of $400,000. See part 1(a), *supra.*

In return, the executor argues that the schedule of assets attached to the agreement and provided to Attorney Fadrowska five days before the signing of the agreement listed each of the decedent's assets with specific valuations. According to his schedule, the decedent's real estate holdings were valued at $1,136,000, and his personal property at $196,960, for a total value of $1,332,960.

There are also the facts that although the mortgages on the decedent's property were not set out in his schedule of assets, the plaintiff admitted at trial that during this time, she was aware that there was a mortgage on his Florida property and that neither she nor Attorney Fadrowska requested any additional information from Attorney Smith concerning mortgages or liabilities on the decedent's real estate holdings during the five-day period preceding the signing of the agreement.

We recognize that the decedent's net worth was an important and relevant factor to be considered in evaluating the reasonableness of any proposed settlement of a party's alimony and property rights. In the present case, however, the decedent's estimate of his worth and resources was an error in the plaintiff's favor.

While the plaintiff asserts that she was not "fully informed" of the decedent's net worth, there is nothing in the judge's findings or the evidence to show any way in which the disclosure of information reducing the decedent's net worth would have materially affected the plaintiff's decision to sign the agreement. In the absence of any showing of prejudice or unfairness to the plaintiff, we conclude that the decedent's failure to list the mortgages on his real estate holdings set out in his schedule does not give rise to grounds for invalidating the parties' agreement.[7]

(iii) *Reasonableness of the agreement.* In *DeMatteo* v. *DeMatteo*, 436 Mass. at 31, the court stated that "[t]he relinquishment of claims to the existing assets of a future spouse, even if those assets are substantial, . . . does not necessarily render an antenuptial agreement invalid." Rather, the reasonableness of the parties' agreement must be determined with reference to "factors [such] as the parties' respective worth, . . . ages, . . . intelligence, literacy, and business acumen, and prior family ties or commitments." *Rosenberg* v. *Lipnick*, 377 Mass. at 672.

---

[7]That is not to say that we approve of what might have been a conscious decision on the part of the decedent and Attorney Smith to omit all mention of the mortgages even though their precise amount might not have been readily ascertainable. Rather than omit the information entirely, the better practice would have been to disclose the existence of mortgages along with an appropriate qualifying statement indicating the lack of information and the reasons for the inability to furnish such information.

In concluding that the agreement here was not fair and reasonable, the judge stated:

> "The Prenuptial Agreement is not fair and reasonable because it stripped the Plaintiff's potential interest in essentially all of the Decedent's real and personal property listed on the Agreement, as if they were unmarried. This left the Plaintiff with no personal or real property from the marital enterprise. It would not be fair to give the Plaintiff such a minimal share of the marital estate when she has difficulty speaking and understanding English, has little education, and a minimal opportunity to acquire future assets or income."

The judge's findings are contradicted by the undisputed evidence.

As earlier stated, the plaintiff and decedent were middle aged. The decedent was a college graduate and the father of four children born of his first marriage. The plaintiff is a high-school graduate who has a daughter born of one of her two prior marriages and who, at the time of her marriage to the decedent, was eighteen or nineteen years of age and followed her mother, the plaintiff, to Watertown where she, the daughter, resided with the plaintiff and the decedent while receiving a college education paid for by the decedent. See part 1(a), *supra.*

In apparent support for the judge's conclusion that the plaintiff "has" difficulty understanding and speaking English, we can only again point out that at the time of the signing of the agreement, the plaintiff was represented by counsel fluent in both Polish and English. See part 3(a)(i), *supra.* While the executor acknowledges in his brief that the plaintiff's "primary language is Polish and that her ability to speak and comprehend English is somewhat limited," he points to numerous undisputed facts that contradict the judge's finding that the plaintiff "has tremendous difficulty with English."[8]

Moreover, we can find nothing in the record before us to

---

[8]As noted by the executor, the plaintiff admitted at trial that she had "mutual" conversations with Attorney Smith during appointments with him. While she had difficulty reading the agreement given her by the decedent, it was not until about two weeks into January, 2002, that the plaintiff, upon the advice of a friend, retained Attorney Fadrowska. See part 1(a), *supra.* During the marriage, the plaintiff provided the decedent with administrative services, that is, she paid checks, opened the mail, and spoke on the telephone with numerous

demonstrate support for the judge's finding and conclusion that the plaintiff's education was somehow lacking. The undisputed fact of the matter is that while residing in Poland, the plaintiff owned two businesses in addition to a condominium, a bank account, and an automobile. Moreover, and as earlier stated, when the plaintiff signed the agreement while being represented by counsel of her choice and after being advised of the decedent's assets, while she withheld full disclosure of hers, she waived any claim to the decedent's assets acquired prior to their marriage in the event of his death.

We next turn to the parties' respective financial worth. As earlier stated in part 1(a), *supra*, the decedent disclosed on his schedule of assets attached to the agreement that he owned real estate valued at $1,136,000, and personal property, primarily bank accounts, money market accounts, and individual retirement accounts, having a total value of $196,960, for a total worth of $1,332,960. When the value of the decedent's real estate holdings at the time of the signing of the agreement is reduced by his then mortgage liability of $400,000, see part 3(a)(ii), *supra*, the total value of his holdings was $932,960. Because the plaintiff failed to disclose to the decedent the extent of her holdings or their values at the time of the agreement, a comparative valuation of their respective financial holdings cannot be made.[9]

We do know that either before the agreement or quickly thereafter, the decedent respected the plaintiff's business acumen. Sometime during the parties' three-year marriage, the plaintiff acquired a third business located in Massachusetts with the financial backing of the decedent.[10] As also related by the plaintiff at trial, she received a weekly salary of $399, as well as health insurance benefits, for administrative or secretarial services she provided NJR, a company that, as previously related, she claimed

business associates. See part 1(b), *supra*. The executor also points to the fact that although the plaintiff utilized an interpreter throughout the trial, there were numerous questions put to her to which she responded without difficulty before the interpreter had an opportunity to translate the questions from English to Polish.

[9]As previously noted, on January 26, 2002, the plaintiff owned two businesses, in addition to a condominium, a bank account, and an automobile, all of an undisclosed value.

[10]The decedent provided the plaintiff with $40,000 to $50,000 and purchased all the necessary equipment for a business she started, Kosmetyka, Inc.

at trial was owned by the decedent. In addition to owning three businesses, a condominium, and a bank account, all of unknown value, the plaintiff has also received proceeds of the decedent's life insurance policy, $100,000, pursuant to the agreement which she claims to be invalid.

Based on *Rosenberg* v. *Lipnick*, 377 Mass. at 672, and *DeMatteo* v. *DeMatteo*, 436 Mass. at 31, and the undisputed evidence, we conclude that the antenuptial agreement made fair and reasonable provision for the plaintiff.

(iv) *The waiver clause.* As earlier related in part 1(a), *supra*, the agreement contained a provision by which both the plaintiff and the decedent acknowledged that each understood its terms and the implications thereof and that each had been "fully advised by counsel of [their] own selection as to all the rights conferred by law upon each of them by virtue of the proposed marriage and the legal effect of [the] agreement." The plaintiff's claim that the waiver clause has no preclusive effect upon her right to challenge the agreement's provisions consists of three sentences in which she asserts that the waiver is without legal consequence because the "[a]greement was executed due to the misrepresentations of the decedent and the parties' mutual counsel."

This argument fails for two reasons. In the first instance, we previously have set out in detail the undisputed facts establishing that the plaintiff was represented by independent counsel of her choice about two weeks prior to and at the time of the signing of the agreement. See part 3(a)(i), *supra*. As for the plaintiff's simple assertion that her assent to the agreement was the result of misrepresentations, we could easily disregard her contention for her failure to comply with Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Even were we to assume that the plaintiff's reliance on the decedent's alleged misrepresentations concerning his will induced her to the sign the waiver clause, her argument would fail for the reasons discussed in respect to her objections to the decedent's will.

b. *The decedent's will.* According to the terms of the decedent's will, his only bequest to the plaintiff was a cash gift in the amount of $120,000. The plaintiff objected to the will on the bases that (1) the judge erred in assigning her the burden of proof on her objections; (2) the will was procured through Attorney Smith's

undue influence on the decedent; (3) the will was made in violation of the confidential relationship between her and the decedent; and (4) the decedent committed a fraud upon her. The third and fourth claims are predicated on the plaintiff's assertion that the decedent broke his oral promises to her that he would leave certain property to her in his will.

In support of her objections, the plaintiff testified that between January 10 and January 26, 2002, she and the decedent discussed the question of what would happen should he predecease her. The decedent assured her that he would provide for her in his will which would "supersede" the antenuptial agreement which, consequently, "didn't matter." As further related by the plaintiff, the decedent promised her that his will would provide that she was to inherit the following property: his condominium in Boynton Beach, Florida; the funds in his personal and business accounts; his pension and retirement accounts; stocks and bonds; and all property and companies they acquired "after and during the marriage."[11]

(i) *Allocation of the burden of proof.* We begin our consideration of the plaintiff's challenge to the decedent's will with the threshold question raised by her claim that the judge erroneously assigned to her the burden of proof on her objections. In support of her contention, the plaintiff simply cites to *Cleary* v. *Cleary*, 427 Mass. 286 (1998), and *Rempelakis* v. *Russell*, 65 Mass. App. Ct. 557 (2006), for the broad proposition that "[t]he burden is upon a fiduciary, such as [the decedent], who benefitted from his dealings with [the plaintiff] to establish that he did not violate his obligations." We will assume for purposes of decision that the plaintiff's two-sentence assertion that the burden of proof was erroneously placed upon her constitutes argument within the meaning of Mass.R.A.P. 16(a)(4).

In *Cleary* v. *Cleary*, 427 Mass. at 295, the court stated that a "fiduciary who benefits in a transaction with the person for whom he is a fiduciary bears the burden of establishing that the

---

[11]There is some inconsistency in the plaintiff's testimony concerning the decedent's intended disposition of the Watertown residence. At one point in her testimony, the plaintiff stated that the decedent had told her sometime between January 10 and January 26, 2002, that he intended to leave the Watertown residence to his children, in exchange for which they would pay her $100,000.

.

transaction did not violate his obligations." Application of this principle led the court to conclude that the defendant, who had assisted his aunt in designating himself as beneficiary of her annuity policy and who owed her fiduciary obligations in connection with the transaction by reason of his status as her insurance agent, attorney-in-fact, and financial confidant, bore the burden of proving by a preponderance of the evidence that he did not violate his fiduciary obligations in connection with the transaction. *Ibid.* See *Estate of Moretti*, 69 Mass. App. Ct. 642, 643 (2007).

We conclude that the judge correctly assigned to the plaintiff the burden of proof on her allegations. Our conclusion is based upon the general rule set out in *Cleary* v. *Cleary*, 427 Mass. at 290, that is, "a party challenging a will or other document on the ground that it was procured through fraud or undue influence bears the burden of proving the allegation by a preponderance of the evidence." See *Estate of Moretti*, 69 Mass. App. Ct. at 643.

(ii) *Undue influence.* On appeal, the plaintiff's claim of undue influence is grounded on the theory that Attorney Smith's "improper," "limited," and "erroneous" legal advice prevented the decedent from carrying out his desired testamentary scheme and "improperly constrained [his] free will." A claim of undue influence is made out upon a showing that a third party, here Attorney Smith, by means of coercion, overpowered the mind of the decedent and caused him to make a will that embodied Smith's "dominating purpose" rather than the "wishes of the person signing the instrument," i.e., the decedent. *Neill* v. *Brackett*, 234 Mass. 367, 369 (1920). See *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 191-192 (1999), citing *Wellman* v. *Carter*, 286 Mass. 237, 253 (1934), wherein fraud and undue influence are distinguished as separate and distinct grounds for avoiding a will.

In *O'Rourke* v. *Hunter*, 446 Mass. 814, 828 (2006), the court, quoting from *Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 464 (1997), set out the common facts that support a claim of undue influence:

> "Four [factors] are usually present in a case of undue influence: '. . . an (1) unnatural disposition [is] made (2) by a person susceptible to undue influence to the advantage of

someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means.' "

It is the plaintiff's argument on appeal that the testamentary scheme manifested in the decedent's will was "unnatural" because (1) she, the surviving spouse, received a disproportionately small share of the decedent's estate, and (2) she received far less under the decedent's will than she would have had he died intestate. This argument fails. A testamentary disposition is not "unnatural" simply because it favors certain members of the testator's immediate family over others. See *O'Rourke* v. *Hunter, supra* (testatrix's unequal treatment of children in will not inherently unnatural). Moreover, the plaintiff's claim that had the decedent died intestate she would have received more than that provided her in his will begs the question and requires no discussion.

The plaintiff's assertion that the decedent's susceptibility to undue influence was demonstrated by the fact that his will varied from the instructions that he had provided Attorney Smith in his letter of January 9, 2002, is of little persuasive force. The mere fact that the decedent changed his mind and altered his testamentary scheme over the course of the preparation of his will and after consultation with his attorney is not a circumstance having a particular tendency to show the existence of a condition that would render a decedent vulnerable to undue influence. To conclude otherwise would not only establish dangerous precedent but also fly in the face of the judge's finding, supported by the evidence, that the decedent "changed his mind" about his estate plan based upon his wish to leave his real estate to his children and Smith's advice to him.

As for the plaintiff's sweeping allegation that Attorney Smith's "improper," "limited," and "erroneous" legal advice given to the decedent prevented him from carrying out his desired testamentary scheme and "constrained his free will," we need do no more than point out that the judge found that Smith rendered the decedent "professional and sound advice regarding the disposition of his assets upon his death." The plaintiff makes no argument, nor does she cite to any legal authority to support a conclusion, that erroneous legal advice to a testator constitutes

grounds to void a will. Based on Mass.R.A.P. 16(a)(4), we decline to consider the plaintiff's contention.[12]

There is also an absence of evidence of other circumstances suggestive of undue influence upon the decedent by Smith. We find nothing in the record before us to show dominion over the decedent's mind or that his will in fact expressed the wishes of Smith. Rather, the undisputed evidence shows that the decedent was an active and experienced businessman in full command of his affairs who was neither ill, dependent, nor enfeebled at the time of the execution of his will. See *Collins* v. *Huculak*, 57 Mass. App. Ct. 387, 394 n.8 (2003). Even if the legal advice given the decedent by Smith were erroneous and even had it been shown that such "erroneous" legal advice affected or otherwise influenced the decedent's testamentary plan, such a showing falls far short of proof that Smith exercised dominion and control over the decedent's mind. In short, not all influence is "undue." See *Wellman* v. *Carter*, 286 Mass. at 248-249. Cf. *Collins* v. *Huculak*, 57 Mass. App. Ct. at 394 & n.8.

Additionally, Attorney Smith did not benefit under the decedent's will. Rather, the dispositions challenged by the plaintiff favor the decedent's children. There is nothing in the record to show that the children had any connection with Smith. The absence of evidence showing a benefit to Smith by reason of the decedent's will negates any inference that Smith had a motive to procure the contested disposition or that the decedent's will embodied the "dominating purpose" of Smith rather than the wishes of the decedent. *Neill* v. *Brackett*, 234 Mass. at 369.

We find nothing in the record before us to warrant or to justify disturbing the judge's conclusion that the "[p]laintiff introduced no credible evidence that when the [d]ecedent executed the [w]ill he was not in good health, lacked free will to execute the [w]ill, or did not make a natural disposition of his assets."

(iii) *Fraud and abuse of a confidential relationship.* Another of the plaintiff's objections to the decedent's will is grounded

---

[12]Our refusal to pass upon the plaintiff's allegation on this point is not to be construed as an endorsement of Attorney Smith's opinion that he could not draft an instrument that would split ownership of unidentified assets acquired after execution of the will. See, e.g., 1 Page, Wills § 16.11-16.12 (Bowe-Parker rev. ed. 1960).

upon her allegation that the decedent made false oral promises to her. She argues that at the time she signed the antenuptial agreement, she and the decedent had a confidential relationship and that he violated that relationship with his fraudulent assurances that the agreement pertained only to divorce and that he would provide for her in his will. She claims that the decedent's false oral promises have left her "without a roof over her head or the ability to support herself."[13]

For purposes of decision, we will assume that the decedent and the plaintiff had a confidential relationship at the time of the signing of the will.[14] However, our assumption offers no assistance to the plaintiff. In rejecting the plaintiff's arguments on this point, the judge found and concluded that "[e]ven assuming that the [d]ecedent made an oral promise to take care of the [p]laintiff at his death and that he would leave her real estate [and personal property], such promise is unenforceable under the Statute of Frauds. G. L. c. 259, § 5."[15]

It would serve no purpose for us to consider whether the decedent's alleged oral promises to the plaintiff were fraudulent

---

[13]Although irrelevant to our consideration of this claim, we find nothing in the record before us to support the plaintiff's allegation that the decedent's will left her in dire financial straits. As previously set out, the record shows that the plaintiff owns three businesses, two in Poland and one in Massachusetts, as well as a condominium in Poland and a bank account. During the marriage, she provided secretarial services to the decedent for which she was paid a weekly salary of $399. In addition, she has received proceeds from the decedent's life insurance policy as well a cash bequest pursuant to the terms of his will.

[14]In arguing that the decedent abused a confidential relationship, the plaintiff cites to three holdings of this court: *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412 (1980); *Rubin* v. *Rubin,* 29 Mass. App. Ct. 689 (1991); *Yousif* v. *Yousif,* 61 Mass. App. Ct. 686 (2004). However, none of these cases involves an alleged breach of an oral promise to make a will or false representations concerning an intention to make a will. The plaintiff makes no argument why these holdings are controlling in light of the circumstances before us.

[15]General Laws c. 259, § 5, as amended by St. 1965, c. 560, § 1, provides:

"No agreement to make a will of real or personal property or to give a legacy or make a devise shall be binding unless such agreement is in writing signed by the person whose executor or administrator is sought to be charged, or by some person by him duly authorized."

See *Green* v. *Richmond,* 369 Mass. 47, 49 (1975); *Northrup* v. *Brigham,* 63 Mass. App. Ct. 362, 366 (2005).

if her version of such promises are nonetheless unenforceable by reason of the Statute of Frauds. The plaintiff, however, does not address the question whether G. L. c. 259, § 5, operates as a bar to her claim of the decedent's oral promises to make certain provisions for her in his will. Consequently, we need not and do not pass upon her claim that the judge erred in concluding that the decedent's will was not invalid by reason of fraud and a violation of a confidential relationship. See Mass.R.A.P. 16(a)(4).

While the judge found no support for the plaintiff's objections to the decedent's will, her judgment provided that the plaintiff was entitled to the widow's statutory share of the decedent's estate. That provision was undoubtedly based upon her determination that the parties' antenuptial agreement was invalid, a conclusion which we have found to be erroneous.

As here pertinent and as earlier related, see part 1(a), *supra*, the parties' valid and binding antenuptial agreement reads in pertinent part that in the event of one party's death, the other waived "any and all" interest in real estate held by the deceased in his or her sole name or as cotenant with anyone other than the surviving spouse and that "the parties . . . shall, at their option, execute . . . estate plans or wills which are consistent with the provisions" of the agreement, provided, however, that nothing in the agreement "shall limit or prohibit either [party] from naming the other as a beneficiary of their will." Other than the decedent's sole bequest of a cash gift of $120,000 to the plaintiff, the decedent bequeathed his entire estate to his children. See part 3(b), *supra*.

It follows from our conclusion that by entering into the valid antenuptial agreement, the plaintiff waived any right that she might otherwise have had as the decedent's widow pursuant to G. L. c. 191, § 15.

c. *Imposition of a constructive trust.* Almost three months after the issuance of the judgment dated July 21, 2006, invalidating the antenuptial agreement and upholding the decedent's will, the judge entered an order and judgment amending the original judgment and governing a claim the judge had omitted from the original judgment. In this second judgment, the judge denied the plaintiff's request for the imposition of a construc-

tive trust over certain real estate owned by the decedent, that is, property held in the name of Delray.

The judge's denial of the plaintiff's claim of entitlement to a constructive trust was based upon the following reasons: (1) "[a]ll of the funds to purchase the Florida condominium were the decedent's"; (2) "[t]itle was in his name only before he put it in [Delray] out of the plaintiff's reach"; and (3) "[t]he plaintiff's claim to the real estate is based upon oral promises she says the decedent made to her," the enforcement of which "would violate the statute of frauds."

In seeking reversal of the judgment, the plaintiff does not point to any evidence showing error in the judge's factual finding, nor does she make any argument that the judge's conclusion concerning the applicability of G. L. c. 259, § 5, was wrong as matter of law. Rather, the plaintiff's argument is simplistically brief:

> "The [plaintiff] does not dispute that the funds used to purchase the Florida condominium were the decedent's. It was purchased prior to marriage and was not transferred to [a limited liability company]. At issue is the ten unit apartment building which was purchased after the marriage and which was purchased with marital funds. (Please see *Yousif* v. *Yousif*, [61 Mass. App. Ct. 686, 698 (2004)].) There is no dispute that [the plaintiff] performed uncompensated work for [Delray]."

This statement, made without citation to the record or the law, falls so far short of constituting argument within the comprehension of Mass.R.A.P. 16(a)(4) that we decline to consider it.

4. *Conclusion.* The judgment dated July 21, 2006, is reversed in part and affirmed in part. That judgment is remanded to the Probate and Family Court for the entry of a new judgment which is to provide that the parties' antenuptial agreement and the decedent's will control the disposition of his property. The judgment of October 2, 2006, denying the plaintiff's request for the imposition of a constructive trust, is affirmed. The order denying the plaintiff's motion for a new trial is affirmed.

*So ordered.*