Hely, J.
I. Introduction
The plaintiffs were home buyers who employed the defendants as mortgage brokers. The plaintiffs contend that the defendants submitted an intentionally false income statement on a mortgage loan application and caused them to lose a large deposit on their purchase of a house. The court finds that the defendants made an intentionally false and material statement of income on the loan application. They violated G.L.c. 93A, §2, and their fiduciary duty to the plaintiffs.
All of the plaintiffs’ losses were not caused by the defendants. Part of their losses were caused by the plaintiffs’ own conduct and financial situation. The actual damages are therefore limited to the extent to which the defendants’ deceptive conduct caused the plaintiffs’ financial loss. The court finds that the plaintiffs’ actual damages caused by the defendants’ misconduct are $50,000. This amount will be tripled in the judgment because Mr. Wright’s deceptive conduct in violation of Chapter 93A was willful and knowing.
The case was tried to the court without a jury on August 7-9, 2002. The court’s findings are based on the more credible evidence and the reasonable inferences that the court has drawn from that evidence.
II. The Mortgage Broker Relationship and the False Income Statement
The main events took place in 1999. The plaintiffs, Wayne G. Haser and Christine Frederick are a married couple. Together they owned a house on Beacon Street in Newton. They had refinanced the house two or three times before with the help of the defendant Roger Wright, a mortgage broker employed by Arrow Mortgage Corp. In early 1999, the plaintiffs consulted Mr. Wright again regarding their plans to buy a different house in Newton. They focused first on a Waban Hill house and planned an $800,000 loan for this purchase. On February 11, 1999, Mr. Wright and Arrow sent the plaintiffs a preapproval letter that conditionally approved them for a thirty-year, eight percent, fixed rate $800,000 loan.
The plaintiffs’ interest shifted to a Farlow Road house. On March 10, 1999, the plaintiffs signed an offer to purchase the Farlow Road house for $1,160,000. The offer was accepted by the sellers. On March 30, the plaintiffs and the sellers signed a purchase and sale contract. The plaintiffs paid $100,000 as deposit. The contract provided for a July 15, 1999, closing.
*249 In early April, Ms. Frederick told Mr. Wright that the plaintiffs had signed a purchase and sale agreement for the Farlow Road house. She told him the purchase price. They agreed that Mr. Wright would help them obtain a mortgage loan for Farlow Road and that part of the purchase money would come from the expected sale of the plaintiffs’ Beacon Street house.
The plaintiffs did not give Mr. Wright a copy of the Farlow Road purchase and sale agreement, and he did not ask for one. The Farlow Road purchase and sale agreement contained a mortgage contingency clause. The mortgage contingency clause allowed the buyers to terminate the agreement without penalty if they could not obtain a mortgage loan by diligent efforts and if they gave the sellers written notice of this by April 16, 1999.
In the plaintiffs’ efforts to obtain a mortgage, Christine Frederick did nearly all of the communicating with Roger Wright. To help pay for the Farlow Road house, the plaintiffs initially planned to sell their Beacon Street house. They put the Beacon Street house on the market at a very high asking price. At that price, the house generated little interest from buyers. The plaintiffs declined to make significant asking price concessions to generate more buyer activity.
The plaintiffs were determined to buy the Farlow Road house, but they were ambivalent about selling their Beacon Street house. They were confident that they could finance the Farlow Road purchase one way or another. They let the April 16 mortgage contingency deadline go by without trying to. extend it. Although Ms. Frederick regularly called Mr. Wright about the status of their loan application, she did not specifically tell him about the April 16 mortgage contingency deadline.
Mr. Wright obtained correct income figures from the plaintiffs as part of the process of obtaining a loan for their next house purchase. Christine Frederick was an assistant professor at Dana-Farber Cancer Institute. Her income was virtually all salary, and it did not change much from year to year. In July 1999, she received a three percent raise from Dana-Farber. As of July 1, 1999, Ms. Frederick’s Dana-Farber salary income was $85,284 per year or $7,107 per month. Ex. 17. She earned an additional $4452 per year ($371 per month) from Harvard University. Ex. 17, 23. Her total pre-tax salary income as of July 1, 1999, was $89,736 per year ($7478 per month).
Wayne Haser had no income in 1999. He was formerly employed by Dana-Farber as a biochemist, but in the spring of 1999 he was a full-time, second year law student. Ms. Frederick gave Mr. Wright the plaintiffs’ correct current income figures.
By late July, the plaintiffs were continuing with the plan to buy the Farlow Road house, but they decided not to sell their Beacon Street house. To assist in financing the Farlow Road purchase, they decided to refinance the Beacon Street house instead of selling it. Mr. Wright expressed some concern to Ms. Frederick about being able to obtain financing for the Farlow Road purchase without selling the Beacon Street house. Ms. Frederick sent Mr. Wright a memorandum on July 27 requesting a “cash-out refinance” for the Beacon Street house. On July 29, she sent him a letter from Dana-Farber and a pay stub from Harvard University showing her correct current salary income. Ex. 17.
By agreement between the sellers and the plaintiffs, the Farlow Road closing date had previously been extended to July 30. Through their attorney, Catherine Clement, the plaintiffs obtained a further extension of the Farlow Road closing date to Monday, August 16. To obtain this extension, the plaintiffs had to pay the sellers $4452 for their costs. This cost to the plaintiffs was caused by the plaintiffs’ own decisions and delays regarding the pricing of the Beacon Street house and their inability or unwillingness to sell it. This cost was not caused by any conduct of the defendants.
The plaintiffs’ late July decision to not sell the Beacon Street house made it much more difficult for Mr. Wright to obtain the Farlow Road loan for the plaintiffs in the brief time before the August 16 closing date. Mr. Wright prepared an application for the Beacon Street refinancing using $7,107.00 per month as the figure for the plaintiffs’ combined income. Ex. 14, Application, p. 2. This was the Dana-Farber figure that Ms. Frederick had given Mr. Wright, and it was the correct figure for her Dana-Farber salary.
Mr. Wright also prepared an application for the Farlow Road loan with the false figure of $18,750.00 per month for the plaintiffs’ combined income. This false amount was more than twice the plaintiffs’ actual income. Mr. Wright intentionally used this grossly false income figure to increase the chance of approval by the lender. The plaintiffs did not give Mr. Wright this false income figure; Mr. Wright created it. Ms. Frederick had given Mr. Wright the correct income figures for their income before July 1. On July 28, Ms. Frederick sent Mr. Wright the plaintiffs’ correct and slightly revised income figures. She sent him a letter from Dana-Farber, showing a slight July 1 raise, and a pay stub from Harvard. See Ex. 17 and 33. The court does not believe Mr. Wright’s conflicting explanations for the false income statement in the Farlow Road loan application.
On August 2, the plaintiffs closed on the re-financing mortgage loan on their Beacon Street house. The loan amount was $336,000 with a fixed rate of 7.125 percent. The lender was Ohio Mutual. The plaintiffs’ monthly principal and interest payment on this loan was $2264. Ex. 15.
On or about August 3, Mr. Wright brought loan application papers to the plaintiffs house for them to sign. He had them sign applications regarding both *250 the Beacon Street refinancing and the Farlow Road loan. The plaintiffs signed all the documents.
Mr Wright instructed them to write “5/10/99" in the date spaces next to their signatures. He explained that the May date was appropriate because the application was asking for their financial information as of May when they first began the application process. The plaintiffs accepted this and wrote in the ”5/10/99" date next to their signatures.
More importantly, Mr. Wright had prepared the Farlow Road loan application form with the false income statement of $ 18,750 per month. The plaintiffs signed this application and either did not read or were knowing accomplices to this grossly false income statement. See Ex. 10. They signed the form certifying that “the information provided in this application is true and correct” and acknowledging “that any intentional or negligent misrepresentationfs )... may result in civil liability and/or criminal penalties, including, but not limited to, fine or imprisonment...”
Both plaintiffs were highly educated persons. They were in their mid-forties, and they had held responsible professional positions for many years. They had a legal duty to read their main fact representations in their loan application before signing it. I believe their testimony that they did not read the false income statement before signing the application. Their lack of interest is suspicious, but I find that it did not amount to knowing complicity.
The plaintiffs did not fully realize that they had signed a false income statement until August 13, three days before the August 16 closing date. The plaintiffs and their attorney were becoming concerned that the loan might not be approved in time. On August 9, Washington Mutual approved the Farlow Road loan as the lender. See Ex. 21. Mr. Wright called Ms. Frederick and told her that their loan had been approved. Mr. Wright expressed relief at the approval, and he mentioned “fictitious figures.” Ms. Frederick was also relieved by the loan approval news. She was slow to react to the “fictitious figures” comment. Ms. Frederick made no response to this comment until August 13 when she told Mr. Haser and Attorney Clement about it. Mr. Haser became alarmed. He called Mr. Wright on August 13 and asked for a copy of the application forms that they had signed. The plaintiffs received a copy of the forms later that day, and they discovered the false income statement.
On August 14, the plaintiffs notified Mr. Wright that they would not proceed with the loan on the basis of the distorted income statement. On Sunday, August 15, the plaintiffs’ attorney notified the sellers’ attorney that they would not be going forward with the purchase of the Farlow Road property. As a result of the plaintiffs’ failure to perform, the $100,000 deposit went to the sellers under the terms of the purchase and sale agreement.
III. Liability Conclusions on the Plaintiffs’ Specific Causes of Action
Mr. Wright’s intentional preparation and submission of the loan application with the materially false income statement was an unfair and deceptive act in trade or commerce. He violated G.L.c. 93A, §2. Because he knew that the income statement was materially false when he prepared and submitted it, this was a willful and knowing violation. The plaintiffs are therefore entitled to “up to three but not less than two times” their actual damages. G.L.c. 93A, §9(3). The false income statement was not a minor exaggeration. The materiality and magnitude of the false statement and its willfulness call for triple rather than double damages.
Mr. Wright’s intentionally false income statement also breached his fiduciary duty to the plaintiffs. This duty arose from the mortgage broker and special trust relationship that had developed between these parties. Berenson v. Nirenstein, 329 Mass. 285, 288-98 (1950) (fiduciary relationship arose between a commercial buyer and a broker in the purchase of all the stock of a business).
With regard to the plaintiffs’ contract claim, Arrow Mortgage Corporation’s contract to provide mortgage broker services to the plaintiffs included an implied duty of good faith and fair dealing. Mr. Wright breached this when he instructed the plaintiffs to sign the application with the false income statement. It is not clear, however, that the plaintiffs had a contract with Mr. Wright rather than with Arrow Mortgage Corp. The contract claim also involves a statute of frauds issue (G.L.c. 259, §7), but this could probably be overcome by the loan documents signed by Mr. Wright. The contract issues turn out to be unimportant because Mr. Wright’s deceptive conduct was a violation of Chapter 93A, and this makes him personally liable on the plaintiffs’ Chapter 93A claim.
On the claim of the common-law tort of deceit, the traditional elements may not fit exactly. The plaintiffs were not aware of and thus did not rely on the false income statement in a narrow sense. What they relied on was Mr. Wright’s duty to guide them through the loan application process with honesty and good faith. His deceptive conduct in this case is more appropriately treated as a Chapter 93A violation and a breach of a fiduciary duty. The plaintiffs’ actual damages are the same whether Mr. Wright’s misconduct is treated as a Chapter 93A violation, a breach of fiduciaiy duly, a breach of contract, or deceit.
IV. The Cause-of-Damages Issue
The difficult remaining issue is to what extent did Mr. Wright’s deceptive conduct cause of the plaintiffs’ loss of the deposit.
The plaintiffs’ own delays and financial decisions prior to August 3 were a substantial cause of the loss of the deposit. When the Beacon Street house did not *251 sell at the plaintiffs’ price, the plaintiffs made a last minute decision to take out a new $336,000 loan on the Beacon Street house while still going forward on the purchase of a $1,160,000 second home. They planned to take on an additional $870,000 loan on the Far low Road house.
The plaintiffs’ combined monthly payments on the Beacon Street and Far low Road loans would have been $7,792. Ex. 15 and 16. This was solely for principal, interest, real estate taxes and hazard insurance. It' does not include such things as food, heat, water and Federal and state income taxes. This was more than one hundred percent of their $7478 monthly pre-tax income.
The plaintiffs’ financial situation and conduct prior to August 3, especially their late July decision to not sell the Beacon Street house, imposed virtually insurmountable obstacles for any broker or lender in producing an $870,000 loan by the August 16 closing date. By August 3 the plaintiffs were already in grave danger of losing their deposit, and this was not caused by any breach of duty or delay by Mr. Wright. Mr. Wright’s Chapter 93A violation and breach of fiduciary duty did not occur until August 3 when he prepared the false application and instructed the plaintiffs to sign it. It is probable that the plaintiffs would have lost the deposit anyway if Mr. Wright had properly informed them that he could not honestly obtain the $870,000 loan by August 16 considering their financial constraints and their late July decision to not sell the Beacon Street house.
Mr. Wright nonetheless had a paramount duty to deal honestly with the plaintiffs and with the lender. Mr. Wright’s mortgage broker relationship with the plaintiffs did not guarantee them a loan. His legal duty to the plaintiffs was to use good faith, diligence and reasonable skill to obtain a loan honestly. If the plaintiffs’ financial and time obstacles made it impossible to honestly obtain a loan, Mr. Wright had a duty to tell them so.
The plaintiffs cannot be faulted for not going forward with the falsely obtained loan and for terminating their relationship with Mr. Wright once they discovered the deception. It would have been fraudulent and criminal for the plaintiffs to close on the loan based on the materially false application. If Mr. Wright had not resorted to the deception and had disclosed to the plaintiffs the inability to obtain a loan with the real income figure, the plaintiffs might still have been able to find some difficult alternatives short of losing the deposit. Mr. Wright’s deceptive conduct beginning on August 3 took away the plaintiffs’ last opportunity to save the deposit, even though that opportunity was fraught with difficulty.
Considering the plaintiffs’ own conduct and financial situation prior to August 3, Mr. Wright’s deception and breach of duty beginning on that date caused no more than half of the plaintiffs’ loss regarding the deposit. On the totality of the credible evidence, the court finds that the plaintiffs’ actual damages caused by Mr. Wright’s Chapter 93A violation and breach of duty were $50,000.
V. Arrow’s Chapter 93A Liability
The defendant Roger Wright was employed by the defendant Arrow Mortgage Corp. Arrow’s liability for its employee’s deceptive conduct is not automatic. If the employee was acting outside the scope of his employment, the employer is not liable under Chapter 93A. Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 859 (1986). An employer’s Chapter 93A liability depends on “a consideration of the factors relevant to scope of employment determinations bearing on the imposition of vicarious liability on employers for the tortious conduct of their employees.” Id.
Mr. Wright’s mortgage broker services and his conduct in deciding how to submit the loan application was a .responsibility “of the kind he . . . [was] employed to perform,” even if the employer never authorized him to make materially false income statements. Id. His mortgage broker work for the plaintiffs was "substantially within the authorized time and space limits” of his employment. Id. Mr. Wright’s deceptive conduct was motivated in part by a purpose to serve the employer as well as to serve himself and the plaintiffs. This too weighs in support of Arrow’s liability. Id. Arrow is a small company owned by Roger Wright’s brother. The corporation was in a good position to supervise and be aware of the individual broker’s conduct, even though there is a lack of evidence that someone higher up in the company knew of the deceptive conduct. Applying the Wang principles to the facts of this case, the court has no difficulty in concluding that Arrow is liable under G.L.c. 93A for Roger Wright’s deceptive conduct.
VI. Order
The judgment will be for the plaintiffs against both defendants, with joint and several liability. The judgment will include the following items:
total damages under G.L.c. 93A, §9(3) in the amount of $150,000;
prejudgment interest on the actual damages amount of $50,000 at the statutory rate of twelve percent, running from August 4, 2000, the date the action was entered; and
attorney fees and costs to be established by the procedure described below.
Plaintiffs’ counsel may submit a detailed affidavit to establish their attorney fees and costs regarding the Chapter 93A violation. If the defendants challenge the requested fees and costs, they may submit an opposing memorandum stating their reasons within twenty days of receiving the plaintiffs’ counsel’s affidavit. If a written opposition is received, the court will schedule a hearing on the attorney fees and costs. The Rule 9A procedure should not be followed.