Leibensperger, Edward P., J.
This action arises out of renovation work done on a multi-unit house owned by the plaintiff, Shirley Graham (“Graham”), in Cam *570 bridge, Massachusetts. Graham contacted Just A Start Corporation (“Just A Start”), a nonprofit organization devoted to community development, to facilitate the renovation. Defendant Choo and Company, Inc. (“Choo and Company”) prepared an engineering plan for some of the work, and other defendants provided contractor services.[2] Graham alleges that the renovation work was not completed in a workmanlike manner, and she filed the following claims in a verified amended complaint: (1) equitable relief, against Just A Start (Count I); (2) negligence, against all defendants (Count II); (3) breach of contract/breach of express and implied warranties, against all defendants (Count III); (4) misrepresentation, against all defendants (Count IV); (5) violation of G.L.c. 93A, against all defendants (CountV); and (6) violation of G.L.c. 109A, against R.E. Traniello Plumbing and Heating, Inc., Ralph E. Traniello, and Lisa J. Traniello (Count VI). The action is now before the court on motions to strike and for summary judgment by Just A Start, James Sleeper (“Sleeper"), and Alan LaBella (“LaBella”) (collectively, “Just A Start defendants”), and on a motion for summary judgment by Arthur Choo (“Choo") and Choo and Company (collectively, “Choo defendants”). For the following reasons, the Just A Start defendants’ motion to strike is DENIED, the Just A Start defendants’ motion for summary judgment is ALLOWED in part and DENIED in part, and the Choo defendants’ motion for summary judgment is ALLOWED in part and DENIED in part.
BACKGROUND
The relevant undisputed facts viewed in the light most favorable to Graham are as follows. Certain facts are disputed and are noted herein.
Graham is a single woman in her mid-sixties who is unsophisticated in property renovation matters. She owns a three-unit house in Cambridge, Massachusetts which, in 2004, had structural issues that caused sloping in the rental units on the second and third floor. Just A Start is a nonprofit corporation that aims to benefit low-and moderate-income individuals through community development programs, including the Home Improvement Program (“HIP”), the program involved in the renovation of Graham’s house. Just A Start has a line of credit with Cambridge Savings Bank which, through the HIP, it extends to qualified homeowners at up to $50,000 per project at a zero to three percent interest rate. Just A Start does not require homeowners to pay for its services under the HIP program, nor does it charge homeowners any fees.
On May 25, 2004, Graham approached Just A Start in order to resolve the structural issues in her house. She completed a loan application, which included signing a document titled “Just A Start Home Improvement Program General Release,” dated May 26, 2004 (“5/26/04 Release”). The document indicates that the undersigned acknowledges the following:
1. Services received by Just A Start employees are not to be considered professional/expert in nature to be used in lieu of appropriate legal, accounting, engineering or architectural services.
***
They [the undersigned] hereby waive/release claims they may have against Just A Start as a result of any performed or omitted [sic] in connection with the services provided to the property listed below.
Sleeper, Just A Start’s Chief of Construction Services, conducted an initial examination of Graham’s house to assess the work required and estimated the cost. Just A Start eventually approved a $40,000 loan to Graham at three percent interest, secured by a November 2004 mortgage in the same amount on Graham’s property.
Choo and Company was hired in early 2005 to formulate an engineering plan to fix the structural issues in Graham’s house. Its plan involved installing a steel I-beam in the ceiling of the basement of Graham’s house running from front to back which would lift the house’s sagging structure. In August 2005, Third Generation Construction, Inc. (“Third Generation”), the project’s general contractor, installed the steel beam according to Choo and Company’s plans. Graham was home at the time standing in a hallway on the first floor. Immediately upon installation of the beam, Graham felt the house drop. She also noticed that one set of the house’s stairs had shifted a few inches from right to left. Soon thereafter, Graham observed new cracks in the foundation wall in the basement and a drop in the ceiling of the third-floor unit. Graham expressed concerns to Sleeper and LaBella, Just A Start’s Deputy Director of the HIP. Both individuals examined the basement of Graham’s house but did not observe any new damage. By letter dated August 8, 2005, Choo informed the Cambridge Inspectional Services Department that he had reviewed “the work required in our foundation repairs. The work appears to be in concept with our plans and are satisfied [sic] with the work."
In addition to the loan for the work done to the house’s structure, Graham took out two more loans with Just A Start in the amounts of $25,000 and $9,000 to address other parts of the house, such as the heating and flooring.[3] Each of these loans was also secured by a mortgage on Graham’s house in the amount of the loan. In connection with the $9,000 loan, Graham signed another document titled “Just A Start Home Improvement Program, General Release,” dated October 28, 2005 (“10/28/05 Release") (collectively with 5/26/04 Release, “Releases”).[4] Like the 5/26/04 Release, the 10/28/05 Release provided that the undersigned acknowledges that:
1. Services received by Just A Start employees are not to be considered professional/expert in nature *571 to be used in lieu of appropriate legal, accounting, engineering or architectural services.
[[Image here]]
They [the undersigned] hereby waive/release claims they may have against Just A Start as a result of any performed or omitted [sic] in connection with the services provided to the property listed below.
In the spring of 2006, Graham again expressed concerns to Sleeper and LaBella regarding the structural work done to her house. At Sleeper’s request, Choo examined the basement in Graham’s house in May 2006. He testified that he “did an investigation underneath the stairway to find that the time [sic] of the installation of the beam or shortly thereafter when they were jacking the beam into place, that it had cracked during construction.” He further testified that “[i]t was actually hidden behind the stairway.” In a letter dated May 18, 2006, Choo informed Graham of the following:
What I found in the basement is that then the main beam was re-supported. The distribution of weight changed the loading from an existing column on the secondary bearing wall. To correct this situation, the second bearing wall will have to be slightly jacked and the column shimmed to return the additional support under the secondary bearing wall. This type of shimming is required for this type of renovation. I do not see any evidence that there was any additional structural failures [sic].
Because of her continuing concerns, Graham hired a structural engineer, Rene Mugnier (“Mugnier”), to examine the work done in her basement. In a report dated May 19, 2006, Mugnier described the structural condition in the basement and then stated the following:
Unfortunately, the new construction dealt with the center bearing line only and not with any other bearing line, leaving these joists veiy badly un-derdesigned .. . We also noticed that the joist hangers supporting the joists to the new nailer on top of the beam were extremely improperly and unprofessionally erected ... It is our professional opinion, that the situation is very improper and that the settlement will continue to occur . . . We are particularly concerned in one of the areas adjacent to an opening in the floor where the header is supported by a single 2x8. This 2 x 8 is extremely underdesigned, and as a result, it has badly cracked. The situation is hazardous and should be shored immediately.
Graham and Just A Start thereafter attempted to resolve the structural issues, but they could not agree on how to do so. Graham filed the verified complaint in this action on March 30, 2009. On April 10, 2009, the Court (Fremont-Smith, J) entered a preliminary injunction barring a foreclosure on Graham’s house. Graham filed a verified amended complaint on July 21, 2009, which added Count VI, and a second verified amended complaint on May 27, 2011, which corrected the name of Choo and Company.
DISCUSSION
I. Summary Judgment Standard
Summary judgment is appropriate where there are no genuine issues of material fact and the moving parly is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Kourouvacilis, 410 Mass. at 716. Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion." See Pederson, 404 Mass. at 17.
II. Analysis A. The Just A Start Defendants’ Motion to Strike
In their motion to strike, the Just A Start defendants argue that certain portions of Graham’s affidavit must be struck because they contradict prior statements Graham made under oath. See Ng Bros. Cortstr. v. Cranney, 436 Mass. 638, 648 (2002) (“[T]he non-moving party cannot create a material issue of fact and defeat summary judgment simply by submitting affidavits that contradict its previously sworn statements”). An examination of the materials the Just A Start defendants cite, however, demonstrates that there are no contradictions between Graham’s affidavit and prior statements.
First, the Just A Start defendants cite that portion of Graham’s affidavit where she states that LaBella did not review or explain the contents of the Releases with her, and compares that to her Responses to Requests for Admissions where she admits that she signed the Releases. They argue that because “one who signs a written agreement is bound by its terms whether he reads and understands it or not,” Cohen v. Santoianni, 330 Mass. 187, 193 (1953), the two sets of statements are contradictoiy. It is only by operation of the law just quoted, though, that a court may consider the statements inconsistent for purposes of determining a party’s liability. Standing alone, the statements are not contradictoiy.
*572 The Just A Start defendants next cite Graham’s affidavit where she states that she did not approve of the contractors’ work before they were paid. To establish a contradiction, the defendants cite the contracts Graham entered into with the contractors and one particular form Graham signed that approved the release of funds to Choo and Company. The problem with the Just A Start defendants’ argument here is that Graham’s signature on these documents is not a sworn statement or a statement made under oath. See Ng Bros. Constr., 436 Mass. at 648; Phinney v. Morgan, 39 Mass.App.Ct. 202, 207 (1995) (“The plaintiffs’ affidavits and that of their expert cannot be used to contradict previous statements made by the plaintiffs under oath in order to create a material issue of fact to defeat summary judgment”).
Finally, the Just A Start defendants cite paragraph tweniy-six of Graham’s affidavit, where she states that she does not remember meeting LaBella in March 2006. They argue that this contradicts Graham’s earlier statement in her Responses to Requests for Admissions that she could not admit or deny a March 2006 meeting with LaBella. Again, these statements are not contradictory. Rather, both suggest that Graham does not remember meeting with LaBella at that time.
Where the Just A Start defendants have failed to show any contradictory statements in Graham’s affidavit, the court will not strike any portion of the affidavit.
B. The Just A Start Defendants’ Motion for Summary Judgment 1. Releases
It is undisputed that Graham signed the Releases. The Just A Start defendants argue that the Releases are valid and therefore bar all claims against Just A Start and its employees, Sleeper and LaBella. Graham argues that the Releases were procured by fraud and are ambiguous, and therefore invalid.
At the outset, the Court notes that “Massachusetts law favors the enforcement of releases.” Sharon v. Newton, 437 Mass. 99, 105 (2002). Absent fraud, a releáse of claims, including future claims, is valid, even if the person releasing the claims does not read or understand the contents of the release. See id. at 103, 105. Here, citing her deposition testimony and affidavit, Graham claims that LaBella fraudulently induced her into signing the Releases. She testified that LaBella told her that the documents she was signing were in connection with a $300 fee paid to the Registry of Deeds, and she stated in her affidavit that LaBella “told me that the ‘Release’ had only to do with filing fees at the Registry of Deeds and nothing more.”[5] Misrepresentation requires that the allegedly misled person reasonably and justifiably rely on a false statement. See Collins v. Huculak, 57 Mass.App.Ct. 387, 391 (2003). While in many cases it is a question of fact whether the person justifiably relied on the alleged misrepresentation, see id. at 392, here no trier of fact could find justifiable reliance, even assuming that Graham’s testimony accurately reflects the circumstances surrounding her execution of the Releases.
“The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if . . . its falsity is obvious to him.” Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 468 (2003), quoting Restatement (Second) of Torts §541 (1977). If a cursory examination or investigation of the statement would have revealed its falsity, there can be no justifiable reliance. See Collins, 57 Mass.App.Ct. at 392, quoting Restatement (Second) of Torts §541 cmt. a. While Graham testified that when she signed the 05/26/04 Release, LaBella kept it and other documents in front of him where she could not see them, she also testified that “I signed [the release], and I gave it back to him.” This indicates that Graham had the 05/26/04 Release in front of her (at least for a moment) and could have examined its contents.[6] Even a first glance would have shown that the document was, in fact, a release of claims, as it is titled, in all capital letters, “General Release” and the first section contains the release language. See Kuwaiti Danish Computer Co., 438 Mass. at 468 (reliance unreasonable as matter of law where “ [a]ll that was required of [the plaintiffs representatives] was that they read the document to ascertain the obvious”). Accordingly, any reliance by Graham on statements that did not highlight the “release” portion of the document was not justifiable. See id., quoting Restatement (Second) of Torts §540 cmt. a (“[I]f a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in §541”); see also Collins, 57 Mass.App.Ct. at 392-93 (where father demanded sons’ executions of documents he kept mostly hidden but which required their signatures to be valid, sons’ reliance on father’s statements not reasonable).
Graham also argues that the Releases are invalid because they contain a fatal ambiguity. Each document provides the following: “[The undersigned] hereby waive/release claims they may have against Just A Start as a result of any performed or omitted [sic] in connection with the services provided to the property listed below.” While Graham is correct that any ambiguity in the Releases would be strictly construed against Just A Start as the drafter, see Leblanc v. Friedman, 438 Mass. 592, 599 n.6 (2003), the plain language of the Releases, in context, demonstrates that the Releases are free from ambiguity, see Browning-Ferris Indus., Inc. v. Casella Waste Mgt. of Mass., Inc., 79 Mass.App.Ct. 300, 307 (2011) (determination of ambiguity in contract is question of law).[7]
It appears that a word is missing from the language quoted above, but to assert that the missing word renders the meaning of the entire clause ambiguous • is hypertechnical and illogical. Despite the missing *573 word, it cannot be said that the Releases’ “phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken.” Post v. Belmont Country Club, Inc., 60 Mass.App.Ct. 645, 652 (2004), quoting Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989) (defining ambiguity in contractual language); see also Browning-Ferris Indus., Inc., 79 Mass.App.Ct. at 307 (“An ambiguity arises from language susceptible of different meanings in the eyes of reasonably intelligent persons”). Reading the clause quoted above as a whole, and considering that it is contained in a document titled “Just A Start Home Improvement Program General Release,” it is clear that the effect of the clause is to release Just A Start from liability for any claims Graham may have.
This brings the Court to the liability of Sleeper and LaBella under the Releases. The Just A Start defendants assert that the Releases bar claims against Just A Start and its employees. The Court disagrees. The specific release language only mentions Just A Start: “(the undersigned] hereby waive/release claims they may have against Just A Start.” The court construes such unambiguous language “in its usual and ordinary sense” to indicate that the Releases only bar claims against Just A Start, notits employees. McCann v. McGowan, 71 Mass.App.Ct. 513, 516-17 (2008). Accordingly, under the Releases, Just A Start—but not its employees, Sleeper and LaBella—is entitled to summary judgment on all of Graham’s claims.
2. Claims against Sleeper a. Count II: negligence
Graham bases Count II on the allegedly negligent “construction, remodeling, and home improvement work” performed on her house. From the summary judgment materials, it is clear that the focus of Count II is the August 2005 installation of the support beam in the basement. The Just A Start defendants assert that the three-year statutes of limitations in G.L.c. 260, §§2A and 2B bar all of Graham’s tort-based claims, including Count II.[8] Graham filed her complaint on March 30, 2009, so her negligence claim must have accrued no earlier than March 30, 2006. Otherwise, her claim is subject to dismissal under the statute of limitations. The Just A Start defendants argue that Graham’s claim accrued in August 2005, when she noticed damage to her home after installation of the support beam. Graham argues that she did not discover the structural damage to her house and its cause until May 2006, when Choo and Mugnier each examined the house and determined that structural deficiencies existed due to the beam installation.[9]
Though she does not explicitly cite it, it appears that Graham relies on the discovery rule in arguing that she timely filed her negligence claim. Under that rule, “certain causes of action based on inherently unknowable wrongs do not accrue until the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant’s conduct." White v. Peabody Constr. Co., 386 Mass. 121, 129 (1982). Graham cannot benefit from the discovery rule here, however, where the harm to her home was not inherently unknowable. It is undisputed that as soon as Third Generation completed installation of the beam in the basement of Graham’s house in August 2005, she felt the house drop. Graham also indicated in her deposition testimony that soon after the beam’s installation, she noticed the following: (1) a shift of a few inches in one of the house’s stairways from right to left; (2) new cracks in the foundation wall in the basement; and (3) a drop in the ceiling of the third-floor apartment. Thus, Graham was clearly on notice immediately after Third Generation installed the beam that such installation caused damage to her house, and the discovery rule does not toll the applicable three-year statute of limitations. See White, 386 Mass. at 129 (discovery rule inapplicable where plaintiffs experienced leaks from defective roof as soon as construction completed); Mansfield v. GAF Corp., 5 Mass.App.Ct. 551, 554 (1977) (cause of action untimely where brought more than two years after plaintiff discovered leaks, cracks, and blisters in roof soon after its installation).
Graham claims that she could not have known of the damage to her house because, according to Choó’s testimony, the damage he found in May 2006 was hidden behind a stairway. It is well-settled in Massachusetts, though, that “(t]he ‘notice’ required [to trigger the statute of limitations] is not notice of every fact which must eventually be proved in support of the claim . . . Rather, ‘notice’ is simply knowledge that an injury has occurred.” White, 386 Mass. at 130. That Choo found some hidden damage in May 2006 does not negate the fact that Graham knew in August 2005 that other damage had occurred. See Mansfield, 5 Mass.App.Ct. at 555 (‘The fact that [the plaintiff] did not appreciate the extent of the damage until later is immaterial”). Further, as to causation, Graham noticed the damage immediately upon the installation of the support beam and soon thereafter, so she was also on notice that the beam installation likely caused the changes.[10] See Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990) (accrual of claim requires “knowledge or sufficient notice of what the cause of harm was”). She cannot rely on the May 2006 reports of Choo and Mugnier to argue that she did not discover the causal link until then. See Cohen v. State Street Bank & Trust Co., 72 Mass.App.Ct. 627, 632 (2008) (if plaintiff could cite expert’s report of causation as trigger for accrual, “plaintiffs would have unilateral control over the accrual of their cause of action by deciding when to hire an expert or order a report”).
Finally, to the extent that Graham claims that Sleeper examined the house in 2005 after she complained of shifting and assured her that its structure was sound after the installation of the support beam, *574 there is no evidence in the record that Sleeper ever actually said anything to Graham after this investigation. [11] See Malapanis v. Shirazi, 21 Mass.App.Ct. 378, 385-86 (1986) (expressing concern that doctor’s statement that plaintiffs condition was not unusual “might deter . . . a . . . patient from seeking other medical advice”). Rather, Graham testified repeatedly that Sleeper did not say anything to her after examining the house at this time.[12]
Básed on the uncontroverted evidence in the record, Graham was aware as of August 2005 that her house suffered damage due to the installation of the support beam in the basement. Her negligence claim accrued at that time. Because Graham did not file that claim until more than three years later, G.L.c. 260, §§2A and/or 2B bar the claim. Sleeper is therefore entitled to summary judgment on Count II.
b. Count III: breach of contract/breach of express and implied warranties
Under Count III, Graham asserts claims of breach of contract, breach of express warranty, and breach of implied warranty. As to the breach of contract claim, the Just A Start defendants cite Graham’s deposition testimony acknowledging the lack of a written contract between herself and Just A Start for the latter’s services. Graham argues that Sleeper undertook the duties of a home improvement contractor/general contractor, thereby giving rise to an oral contract involving the exchange of Sleeper’s services for Graham’s mortgage indebtedness to Just A Start. Assuming arguendo that all the elements of contract formation (e.g., offer, acceptance, consideration) were present in this alleged exchange, any contract would have been between Just A Start and Graham, not Sleeper and Graham. It is apparent that Sleeper was acting as Just A Start’s employee-agent throughout the entire renovation process, and Graham’s consideration consisted of indebtedness to Just A Start. Thus, Graham could only maintain a breach of contract claim against Just A Start.[13] Graham’s breach of contract claim against Sleeper therefore fails.
Regarding the express warranty claim, such claims are based on the theory that “the defendants are liable to the plaintiff for failure to provide [work] that meets a standard of performance allegedly promised by the defendants . . . [T]he standard of performance is set by the defendants’ promises . . .”[14] Anthony’s Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc., 396 Mass. 818, 822 (1986). Here, the contractors who performed the actual renovations on Graham’s house offered one-year written express warranties, but there is no evidence that Just A Start and/or Sleeper offered Graham the same warranty. To the extent that Graham relies on her testimony that Sleeper told her “he know [sic] how to do the work, he can do it,” such language does not promise a specific result and it therefore cannot be construed as an express warranty. See Coca-Cola Bottling Co. of Cape Cod v. Weston & Sampson Eng’rs, Inc., 45 Mass.App.Ct. 120, 128 (1998) (“[A]n express warranty promises that a specific result will be achieved ...”); see also Klein v. Catalano, 386 Mass. 701, 720 (1982) (no express warranty where architect “did not expressly guarantee a specific result,” but rather, only provided specifications). Graham’s claim of express warranty against Sleeper also fails.
Finally, as to Graham’s claim of breach of implied warranty against Sleeper, the Just A Start defendants argue that the three-year statute of limitations in G.L.c. 260, §2B bars the claim. While the Court agrees, it notes as an initial matter that it seems doubtful that Graham may even maintain an implied warranty claim here. The case Graham cites in support of her claim provides that “[w]hen a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it.” Wolov v. Michaud Bus Lines, Inc., 21 Mass.App.Ct. 60, 64 n.8 (1985), quoting Abrams v. Factory Mut. Liab. Ins. Co., 298 Mass. 141, 143 (1937) (emphasis added) (abrogated on other grounds by Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115 (1994)); see also Klein, 386 Mass. at 720 (quoting same in context of architect’s implied warranty). Here, as discussed above, there is no contract between Sleeper and Graham.
Even assuming there was a contract between Sleeper and Graham out of which an implied warranty could arise, the statute of limitations bars any claim based on such warranty. Courts apply G.L.c. 260, §2B to breach of implied warranty claims that are in essence negligence claims arising out of expertise given regarding improvements to real property.[15] See Anthony’s Pier Four, Inc., 396 Mass. at 822B823, citing Klein, 386 Mass. at 719 & n. 19 (“Section 2B would bar a breach of implied warranty claim where the elements for breach of implied warranty and for negligence claims are the same”). Here, in the verified amended complaint, Graham alleges under Count III that the defendants “breached their . . . implied warranties of proper workmanship by their improper and defective performance.” As noted above, Graham cites Wolou, which mentions “using reasonable and appropriate care” in the context of an implied warranty. 21 Mass.App.Ct. at 64.
Thus, the gist of Graham’s implied warranty claim is that Sleeper failed to exercise reasonable care, i.e., he was negligent. See Anthony’s Pier Four, Inc., 396 Mass. at 823 (court looks to gist of action to determine whether plaintiff is attempting to “escape the consequences of a statute of repose or statute of limitations on tort actions merely by labelling the claim as contractual”); see also Harris v. McIntyre, 2000 WL 942559 at *7 (Mass.Super. 2000) (Gants, J.) (breach of implied warranty claim based on “failure ‘to construct the buildings in a good and workmanlike man *575 ner[’] ... is different phraseology for claiming that [defendant] was negligent in its construction"). As such, the Court treats Graham’s claim for breach of implied warranty as a tort claim subject to the three-year statute of limitations in G.L.c. 260, §2B.[16] See Coca-Cola Bottling Co. of Cape Cod, 45 Mass.App.Ct. at 121, 123 & n.6, quoting Klein, 386 Mass. at 719 (treating plaintiffs breach of implied warranty claim against engineers, based on design of wastewater facility, as “an ‘implied[ ] promise to exercise that standard of reasonable care required of members of . . . [the defendant’s] profession’... in other words, a professional malpractice claim”). As the court has already concluded, Graham had sufficient notice in August 2005 of the damage to her house as a result of the support beam’s installation to start the accrual of her claims. Because she did not file her claims until more than three years later, the statute of limitations bars her breach of implied warranty claim.
Based on the above discussion, none of the claims asserted under Count III against Sleeper survive summary judgment.
c. Count IV: misrepresentation
Graham alleges three bases for Count IV: allegedly fraudulent representations relating to (1) the licensed status of Just A Start, Sleeper, and LaBella; (2) the nature of the performance of the work to be done on Graham’s house; and (3) the nature of the Releases. As discussed under Count II above, the applicable statute of limitations bars the second basis for Count IV.[17] As for the first basis, there is no evidence in the record that Sleeper represented to Graham that Just A Start and/or its agents were licensed home improvement contractors. In fact, in response to the question whether anyone at Just A Start told her they were a licensed home improvement contractor, Graham answered the following: “No, he [Sleeper] told me he could do the work and he know [sic] what to do. I would assume that he was ...” As to the third basis for Count IV, there is no evidence that Sleeper made any statements regarding the nature of the Releases, as it was LaBella who presented the documents to Graham for execution. Thus, Sleeper is entitled to summary judgment on Count IV.
d. Count V: violation of G.L.c. 93A
In the verified amended complaint, Graham asserts numerous bases for Count V. The Just A Start defendants argue that the claim as a whole fails because Just A Start and its employees were not engaged in trade or commerce. The court concludes that summary judgment is not appropriate on this Count because there are questions of fact regarding whether G.L.c. 93A applies.
General Laws c. 93A, §2 prohibits “unfair or deceptive acts or practices in the conduct of any trade or commerce.” Conduct undertaken in trade or commerce means “those acts or practices which are perpetrated in abusiness context.” Lantner v. Carson, 374 Mass. 606, 611 (1978). In determining whether conduct takes place in a business context, courts examine the following factors: “the nature of the transaction, the character of the parties involved, . . . the activities engaged in by the parties!,] • • • whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons],] . . . and whether the participant played an active part in the transaction.” Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 24 (1997). It is a question of fact whether a person or an entity is engaged in trade or commerce for purposes of G.L.c. 93A. See Brown v. Gerstein, 17 Mass.App.Ct. 558, 570-71 (1984); see also Planned Parenthood Fed’n of Am. Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 493 (1986) (“[W]e need to look at the particular circumstances to determine whether the acts complained of were committed within a ‘business context’ ”).
While Just A Start, Sleeper’s employer, is a nonprofit corporation with charitable status, this alone is not dispositive of the trade or commerce inquiry. See Planned Parenthood Fed’n of Am, Inc., 398 Mass. at 492-93. The Court here is not faced with a legislatively-created organization that clearly does not operate in a business context. See Barrett v. Massachusetts Insurers Insolvency Fund, 412 Mass. 774, 777 (1992) (‘The nature of the transaction and the activity engaged in is the payment of the ‘covered claims,’ and transactions are motivated by legislative mandate, not business or personal reasons”). On the other hand, the record shows that Just A Start’s mission is to benefit low and moderate income individuals through community development programs, and that it does not charge a fee for its services. See Planned Parenthood Fed’n of Am., Inc., 398 Mass. at 493-94 (organization motivated by pro-life policy that did not charge fees for its pregnancy-related services not engaged in trade or commerce).
There are, however, sufficient factors present here to indicate that Just A Start and Sleeper may have been engaged in trade or commerce by acting in a business context. While it is clear that Sleeper did not perform any of the actual construction work on Graham’s house, he nonetheless provided services requiring knowledge and expertise in home contracting. See id. at 496 (Abrams, J., dissenting) (provision of no-fee pregnancy-related services falls under G.L.c. 93A, §l’s definition of trade and commerce as “distribution of services”). For example, he conducted the initial evaluation of the house, determining what needed to be done and how much the renovation would cost. He also visited the work site regularly to inspect the contractors’ work and ensure that it was being completed according to specifications. These activities, which are also carried out by for-profit general contractors, constituted the core function of Sleeper’s *576 role at Just A Start. See All Seasons Servs., Inc. v. Commissioner of Health & Hosps. of Boston, 416 Mass. 269, 271 (1993) (hospital not engaged in trade or commerce in part because “contracting for food services is merely incidental to the hospital’s primary function of providing medical services”). The record shows that Sleeper was actively involved in the entire renovation process, from beginning to end. Compare Begelfer v. Najarian, 381 Mass. 177, 190-91 (1980) (defendants’ minimal participation in isolated transaction precluded applicability of G.L.c. 93A), with Linkage Corp., 425 Mass. at 25 (university “actively involved in all aspects of the arrangement,” which “contemplated a continuing relationship”).
Given the “fact-specific nature of the inquiry,” the trier of fact must determine whether Sleeper and Just A Start acted in a business context in their transaction with Graham. Linkage Corp., 425 Mass. at 26. While the claim against Just A Start is barred by the Releases, Sleeper is not entitled to summary judgment on Count V.[18]
3. Claims against LaBella a.Count II: negligence
The statute of limitations basis for the failure of Graham’s negligence claim against Sleeper also applies here. LaBella is therefore entitled to summary judgment on Count II.[19]
b.Count III: breach of contract/breach of express and implied warranties
Where the Court has already concluded that Graham may not maintain breach of contract and breach of implied warranty claims against Sleeper, the same reasons apply to bar such claims against LaBella.
As for Graham’s breach of express warranty claim, besides there being no evidence that Just A Start and/or LaBella offered an written express warranty, there is also no evidence that LaBella made any statement whatsoever that could be construed as guaranteeing a specific result. See Coca-Cola Bottling Co. of Cape Cod, 45 Mass.App.Ct. at 128.
Accordingly, summary judgment must enter in LaBella’s favor on Count III.
c.Count IV: misrepresentation
The first and second bases for Graham’s misrepresentation claim—statements regarding the licensed status of the Just A Start defendants and the nature of the performance of the work to be done on Graham’s house—fail where, respectively, there is no evidence of a statement regarding licensure and, as discussed above, the statute of limitations bars any claim based on a statement regarding performance. As to the third basis for Count IV—statements regarding the nature of the Releases—-the court has already determined that Graham did not justifiably rely on LaBella’s allegedly fraudulent statements. For these reasons, LaB-ella is entitled to summary judgment on Count IV.
d.Count V: violation of G.L.c. 93A
Because Just A Start and/or Sleeper may have been engaged in trade or commerce under G.L.c. 93A, as described above, the same analysis applies with equal force to LaBella, who was actively involved in both the financial and construction aspects of the renovation of Graham’s housed[20] The motion for summary judgment therefore must be denied as to LaBella’s liability under Count V.[21]
C. The Choo Defendants’
Motion for Summary Judgment 1. Count II: negligence
It is undisputed that Choo and Company provided the plans for the installation of the support beam in the basement of Graham’s house. Where Graham’s negligence claim is based on such installation and was not filed until March 30, 2009, the three-year statute of limitations in G.L.c. 260, §2B bars that claim because the court has already determined that she was aware of sufficient facts in August 2005 to trigger the accrual of any claim based on that event.[22] The Choo defendants are therefore entitled to summary judgment on Count II.
2. Count III: breach of contract/breach of express and implied warranties
Neither the Choo defendants nor Graham address the former’s liability under Count III. Regarding Graham’s breach of contract claim, she does not allege that the Choo defendants or any other defendant breached a specific provision of their contract with her. Indeed, no written contract between the Choo defendants and Graham appears in the record. Rather, Graham alleges under Count III that the “defendants breached their contract with the plaintiff by not performing said work in a proper, workmanlike and professional manner which they expressly contracted to do.” Based on the caselaw discussed above (see Discussion supra at 16-18), the Court construes this claim as one sounding in tort, i.e., the Choo defendants negligently performed their contractual obligations. Cf. Klein, 386 Mass. at 719-20 (refusing to tolerate situation where plaintiff could essentially bring untimely negligence claim as relabeled contractual breach of implied warranty claim). Accordingly, the three-year statute of limitations in G.L.c. 260, §2B bars Graham’s breach of contract claim.
Where the Court similarly construes Graham’s breach of implied warranty claim against the Choo defendants as a tort claim, G.L.c. 260, §2B also bars that claim. Finally, as to Graham’s breach of express warranty claim, there is no evidence in the record that the Choo defendants made any promise to Graham of a specific result of their work. See Klein, 385 Mass. at 720.
Based on the foregoing, summary judgment shall enter in the Choo defendants’ favor on Count III.
*577 3. Count IV: misrepresentation
According to the amended verified complaint, Count IV as asserted against the Choo defendants is based on their alleged misrepresentation regarding the workmanship of their performance. Any claim based on the workmanship of the defendants’ performance is barred by the three-year statute of limitations in G.L.c. 260, §2B. Summary judgment will enter for the Choo defendants on this claim.
4. Count V: violation of G.L.c. 93A
The Choo defendants argue that Count v. fails because there is no evidence that they engaged in unfair or deceptive conduct by, for example, acting in bad faith towards Graham or attempting to extort economic advantage or concessions from her.[23] The record does, however, contain evidence indicating that an unlicensed intern, Sean Losi (“Losi”), drew the plans for the installation of the support beam in Graham’s house. Because “whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact,” Darviris v. Petros, 59 Mass.App.Ct. 323, 329 (2003), the Court concludes that a trier of fact is required to determine whether the Choo defendants’ conduct, including the use of an unlicensed intern, violated G.L.c. 93A.
The Choo defendants are therefore not entitled to summary judgment on Count V.
ORDER
For the foregoing reasons, it is hereby ORDERED that the Just A Start defendants’ motion to strike is DENIED; that the Just A Start defendants’ motion for summary judgment is ALLOWED as to Count II, Count III, Count IV, and Count v. as those claims are asserted against Just A Start Corporation, ALLOWED as to Count II, Count III, and Count IV as those claims are asserted against James Sleeper and Alan LaBella, and DENIED as to Countv. as that claim is asserted against James Sleeper and Alan LaBella; and that the Choo defendants’ motion for summary judgment is ALLOWED as to Count II, Count III, and Count IV, and DENIED as to Count V.

Graham originally sued Choo and Associates, Inc., which is the incorrect name for that defendant. The court permitted her to substitute Choo and Company, Inc. as the correct entity.

Nhe record shows that the $9,000 loan was mistakenly identified as a $10,000 loan on some documents.

Graham also apparently signed a release in connection with the $25,000 loan, but no such release appears in the record.

A claim of fraud requires a false representation of material fact. See Masingill v. EMC Corp., 449 Mass. 532, 540 (2007). Where the Releases do in fact include a provision requiring Graham to pay Registry of Deeds filing fees, there is a significant issue as to whether LaBella made a false representation, even according to Graham’s testimony. As described above, however, the Court need not resolve this issue. The Releases, on their face, establish what the documents are.

Graham testified that when she signed the 10/28/05 Release, “it happened the same way.”

There is no evidence clearly indicating that Just A Start drafted the Releases, but the court infers that it did given the evidence that LaBella presented the Releases to Graham for her signature and that Just A Start’s name and contact information appear at the top of the Releases. See Leblanc, 438 Mass. at 599 n.6.

Section 2A governs “actions of tort” and §2B governs tort actions “arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property.” Section 2B also contains a six-year statute of repose, which is irrelevant to Graham’s claims. See infra note 9. Because both statutes apply three-year limitation periods, it is immaterial whether §2B applies here. See infra note 16.

Graham also argues that all of her tort-based claims are timely because “the statute of limitations on improvements to real estate does not begin to run until the project is substantially complete, M.G.L.A. Ch. 260 §2B [sic], and the work on this job was not completed ...” While §2B addresses substantial completion, it is only in regard to the six-year statute of repose. Graham confuses §2B’s three-year statute of limitations and its six-year statute of repose. The court is only concerned here with the accrual of Graham’s tort-based claims under §2B’s three-year statute of limitations.

Indeed, after testifying that she saw cracks in the foundation wall after the beam’s installation, Graham was asked whether she had observed cracks in the foundation wall before the beam’s installation. She answered, “There were small little cracks, but not like that.”

It appears from his testimony that Sleeper told Graham he could not see anything after examining the house in the spring of 2006.

Graham did testify that Frank Barbosa from Third Generation told her everything was “okay,” but she also testified that she still did not believe so. Indeed, it is undisputed that Graham continued to be concerned about the structure of her house into the spring of 2006, when Choo and Mugnier examined the house. Thus, in August 2005, Graham’s “attention had been adequately directed to” the potential harm caused by the installation of the support beam so as to “stimulate further inquiry.” Malapanis, 21 Mass.App.Ct. at 386; see also Hanson Hous. Auth. v. Dryvit Sys., Inc., 29 Mass.App.Ct. 440, 447 (1990) (visible physical problems with building’s construction—including caulking falling out, bubbling in finish coat, two large cracks, and leaks—“should have stimulated further investigation of the type ultimately engaged in by the plaintiffs consultant"). Like Graham, the plaintiff in Hanson Housing Authority knew of physical problems in its building at a certain time, but did not pursue an independent investigation until some time later. See 29 Mass.App.Ct. at 440, 443.

As the court has already concluded above, the Releases bar all claims against Just A Start.

Because express warranty claims are contract-based, they are not subject to G.L.c. 260, §2B, which only governs tort-based claims. See Anthony’s Pier Four, Inc., 396 Mass. at 822.

While most of the case law treating breach of implied warranty claim as tort claims under G.L.c. 260, §2B focuses on §2B’s statute of repose, rather than its statute of limitations, the rationale for so treating implied warranty claims is *578 the same under both provisions of §2B. See Harris v. McIntyre, 2000 WL 942559 at *8 n.5 (Mass.Super. 2000) (Gants, J.).

Even if Sleeper is not subject to G.L.c. 260, §2B because he does not fall into the category of “economic actors who perform acts of ‘individual expertise’ akin to those commonly thought to be performed by architects and contractors,” Dighton v. Federal Pac. Elec. Co., 399 Mass. 687, 696 (1987) (defining class of actors protected by §2B), the court would apply G.L.c. 260, §2A’s three-year statute of limitations to Graham’s breach of implied warranty claim. The inapplicability of §2B does not change the fact that Graham’s implied warranty claim is a tort claim relabeled as a contract action. See Wolfe v. Ford Motor Co., 386 Mass. 95, 100 (1982) (stating, in context of implied warranty of merchantability under Uniform Commercial Code, that “we find no magic in the label ‘warranty’ but rather we look to the substantive quality of the claims against [defendant) and find them to be essentially tort claims”); cf. Schenker v. Binns, 18 Mass.App.Ct. 404, 405B406 (1984) (citing “policy against allowing form to prevail over substance” in holding that plaintiffs contract claims were subject to Massachusetts Tort Claims Act because “not substantially different” from negligence claims).

Again, because both G.L.c. 260, §2A and 2B govern tort claims and include three-year statutes of limitations, it does not matter whether one or the other applies to Sleeper in regards to Count IV, a tort claim.

In their summary judgment motion, the Just A Start defendants focus only on whether Just A Start and its employees engaged in trade or commerce under G.L.c. 93A rather than arguing that they did not commit any unfair or deceptive acts. In her opposition, however, Graham argues that Just A Start, Sleeper, and LaBella acted as home improvement contractors under G.L.c. 142A and that their failure to be licensed as such is a per se violation of G.L.c. 93A. See G.L.c. 142A, §17. As noted, there is evidence in the record that Sleeper actively participated in the renovation process. While LaBella visited the work site less often than Sleeper, he nonetheless did so, including when Graham or one of the contractors reported a problem. There is also evidence that Just A Start and its employees conducted the bidding process for obtaining contractors’ services, and conflicting evidence regarding the extent to which they controlled the resulting choice of contractors. Further, there is evidence that LaBella and Sleeper controlled—at least in part—the payment of the contractors. Finally, the record reflects that Just A Start had previously worked with at least several of the contractors chosen for the renovation of Graham’s house. Given this record evidence, there is a genuine issue of material fact regarding whether Just A Start, Sleeper, and/or LaBella fall under c. 142A’s definition of contractor. See G.L.c. 142A, §1 (defining “contractor” as “person who owns or operates a contracting business who, through himself or others, undertakes, offers to undertake, purports to have the capacity to undertake, or submits a bid for, residential contracting work”); Mark Bombara Interior Design v. Bowler, 446 Mass. 413, 419B421 (2006) (error to conclude as matter of law that interior designer not acting as contractor under G.L.c. 142A, §1 where he selected subcontractors, all of whom he had previously used, and his standard contract provided he would order all materials and labor).

To the extent that Graham argues that LaBella acted as a fiduciary in performing the functions of a mortgage broker in regard to Graham’s mortgages with Just A Start, thereby tolling the statute of limitations, see Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 519 (1997) (fiduciary’s failure to fUlly disclose facts giving rise to knowledge of claim tolls statute of limitations in equivalent manner to fraudulent concealment under G.L.c. 260, §12), the argument fails. Graham cites Haser v. Wright, 2002 WL 31379971 (Mass.Super. 2002) (Hely, J.) [15 Mass. L. Rptr. 248], in which the Superior Court found a fiduciary relationship between a mortgage broker and homeowners based on a “special trust relationship” that had developed between the two sides. Id. at *4. The only evidence Graham cites to support her contention that LaBella acted as a fiduciary, however, is that she “trusted him.” This is insufficient as a matter of law to establish a fiduciary relationship. See Broomfield v. Kosow, 349 Mass. 749, 755 (1965) (“[T]he plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. The catalyst in such a change is the defendant’s knowledge of the plaintiffs reliance upon him”); Smith v. Jenkins, 718 F.Sup.2d 155, 169B170 (D.Mass. 2010) (noting that Haser “reflects an exception to the usual rule requiring that a fiduciary relationship be defined by a high degree of trust and formality, namely, that where a plaintiff reposes trust and confidence in a defendant, and the defendant knows of the plaintiffs reliance, a fiduciary relationship may be imposed by law” (emphasis in original)).

Additionally, the court previously determined that there are genuine issues of material fact regarding whether Just A Start, Sleeper, and LaBella are subject to G.L.c. 142A. See supra note 18.

In addition to her assertion that LaBella acted as an unlicensed home improvement contractor under G.L.c. 142A in violation of G.L.c. 93A, Graham also asserts that LaBella acted as a mortgage broker and is therefore subject to c. 93A liability. There is a question of fact regarding whether LaBella, a presumably paid employee of a nonprofit organization, places mortgages on residential property “for compensation or gain.” G.L.c. 225E, §1 (defining “mortgage broker”). Additionally, there is a question of fact regarding whether LaBella, should the trier of fact determine that he acted as a mortgage broker, violated 940 Code Mass. Regs. §8.06 (2008), which defines unfair and deceptive acts or practices by mortgage brokers. See 940 Code Mass. Regs. §8.02. Prohibited practices include “makfingl any representation or statement of fact if the representation or statement is false or misleading or has the tendency or capacity to be misleading.” 940 Code Mass. Regs. §8.06(1). While, as discussed above, Graham’s misrepresentation claim fails due to lack of justifiable reliance, §8.06(l)’s quoted prohibition extends beyond misrepresentation to any statement that is or could be misleading, which makes sense given that c. 93A “goes far beyond the scope of the common law action for fraud.” Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975). Thus, the failure of Graham’s underlying common-law misrepresentation claim does not preclude liability under c. 93A. Compare Lily Transp. Corp. v. Royal Institutional Servs., Inc., 64 Mass.App.Ct. 179, 204 (2005) (“[A]s matter of law [sic] even a consumer plaintiffs claim of violation of c. 93A based solely on an underlying but meritless claim for common-law fraud is itself without merit. . .”).

General Laws c. 260, §2B undoubtedly applies to the Choo defendants as architects and engineers. See Klein, 386 Mass. at 715 (G.L.c. 260, §2B applies to “architects, engineers, contractors, and others involved in the design, planning, construction, or general administration of improvements to real property”).

In support of this contention, the Choo defendants cite Diamond Crystal Brands, Inc. v. Backleaf, LLC, 60 Mass.App.Ct. 502 (2004). That case, however, determined whether a breach of contract constituted a violation of G.L.c. 93A and is therefore not particularly instructive here. See id. at 507-08.